Louis CALE, Plaintiff–Appellant,

v.

J.R. JOHNSON, Warden, F.C.I.; et al., Defendants,

James Wahl, Food Service Administrator, F.C.I., Milan, and Melvin Persky, Inmate and Clerk to James Wahl, Defendants–Appellees.

No. 87–1970.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 20, 1988.

Decided Nov. 17, 1988.

944

Martin A. Geer, Eric M. Acker, Mark Bernstein, University of Michigan Law School, Clinical Law Program, Paul D. Reingold (argued), Ann Arbor, Mich., for plaintiff-appellant.

Geneva S. Halliday (argued), Asst. U.S. Atty., Detroit, Mich., for defendants-appellees.

Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Louis Cale appeals from the district court's grant of summary judgment in this *Bivens* action.[1] For the following reasons, we reverse the district court's judgment and remand this case for further proceedings.

I.

Appellant Louis Cale was an inmate at the Federal Correctional Institution at Milan, Michigan (F.C.I. Milan) on November 19, 1982. On that date, at approximately 10:15 a.m. Cale took the diet line lunch tray which he had just been served and complained to the associate warden of operations, Jack Fevurly, concerning the poor quality of food in the diet line. Shortly thereafter, Fevurly met with the administrator of food service, James Wahl, and informed him of Cale's complaint. According to the deposition of the cook foreman, Mikko Peterson, who testified that he had heard this conversation, Wahl responded to Fevurly that he would have Cale locked up and that that would be the end of Cale's complaints. Peterson also deposed that he heard Wahl inform duty correctional supervisor Jerry Wells that Wells was going to "get the duces"[2] at about three o'clock and that Cale was going to be locked up.

At approximately 3:00 p.m., there was an incident in the diet line which led to the filing of disciplinary charges against Cale and Cale's administrative detention. At that time, allegedly under Wahl's direction, inmate Melvin Persky, who worked in the kitchen, approached Cale from behind and placed a small package in his pocket. Cale began shouting repeatedly, "You're trying to set me up." Cale was approached by safety and occupational health specialist Harry Farris who placed his hand around the upper portion of Cale's arm to get his attention. Cale stated to Farris, "Oh, I'm glad it's you Mr. Farris. You are fair. These _____ are trying to set me up." At that time, Wahl shouted at Farris to get the packet from Cale. Farris did not know what Wahl meant by this statement, but Cale threw a piece of paper which was folded in a small square on the top of the main serving line directly in front of Farris. This packet subsequently was determined to contain marijuana. Cale again became very agitated and shouted accusations at Persky.

Wells, the duty correctional supervisor, was called to the scene of the incident. He ordered correctional officers to escort Cale to administrative detention and instructed Wahl to file an incident report documenting the appropriate charges. Cale was thought

---

1. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. "Get the duces" refers to receiving an emergency call.

to have been in possession of marijuana, and he had made threats toward others; therefore, Wells believed that if Cale had been allowed to remain in the general population the lives of others or his own life might have been in jeopardy.

Cale remained in administrative segregation through November 22, 1982, when an investigation of the incident was completed. On November 24, 1982, a three-member unit discipline committee which had considered the incident report written against Cale charging him with threatening another with bodily harm and possession of narcotics concluded that Cale had not committed a violation of the bureau of prison's disciplinary policy. No sanctions were imposed on Cale by the committee. The incident report would have been expunged, but it was retained at Cale's request.

On January 14, 1983, Cale filed a *pro se* Bivens action, alleging conspiracy to violate procedural and substantive due process and cruel and unusual punishment. Original defendants included Warden J.R. Johnson, Fevurly, Wells, Wahl, and Persky.

On September 18, 1983, the district court granted summary judgment in favor of Johnson, Fevurly, and Wells. Wahl renewed his motion for summary judgment. Thereafter, on August 28, 1985, the district court adopted a magistrate's report and recommendation which recommended denial of Wahl's second motion for summary judgment. According to the magistrate, Cale's procedural due process and eighth amendment theories were without merit. However, the magistrate continued, " 'There is a factual dispute as to whether Persky planted marijuana and there are circumstances that raise some doubt whether or not Wahl was involved.' If Wahl did in fact 'frame' plaintiff, substantive due process protections may have been impeded."

On May 28, 1986, this case was transferred from the docket of the Honorable Charles Joiner to that of the Honorable George LaPlata. Subsequently, Wahl filed a third motion for summary judgment. Thereafter, on September 17, 1987, the district court granted Wahl's motion for summary judgment, *sua sponte* granted summary judgment in favor of inmate Persky,[3] and dismissed the complaint.

Cale filed this timely appeal. We are asked to decide whether the district court erred in granting summary judgment in favor of Wahl and Persky. Preliminarily, we must consider our authority to entertain a *Bivens* action in this context.

## II.

### A.

In *Schweiker v. Chilicky,* —— U.S. ——, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Supreme Court recently reconsidered the proper scope of *Bivens* actions.[4] In that case, the Court evaluated its authority to entertain *Bivens* actions as follows:

In 1971, this Court held that the victim of a Fourth Amendment violation by federal officers acting under color of their authority may bring suit for money damages against the officers in federal court. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619]. The Court noted that Congress had not specifically provided for such a remedy and that 'the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation.' Nevertheless, finding 'no special factors counselling hesitation in the absence of affirmative action by Congress,' and 'no explicit congressional declaration' that money damages may not be awarded, the majority relied on the rule that ' "where legal rights have been invaded, and a federal statute provides for a general right to sue for such

---

3. Appellant does not challenge Persky's *sua sponte* dismissal as improper. *But see Yashon v. Gregory,* 737 F.2d 547 (6th Cir.1984).

4. The proper scope of *Bivens* actions is a question of the federal courts' competency, and,

hence, a question of subject matter jurisdiction. *See Bivens,* 403 U.S. at 398–402, 91 S.Ct. at 2005–08 (Harlan, J., concurring in judgment). *see also Chilicky,* 108 S.Ct. at 2466.

invasion, federal courts may use any available remedy to make good the wrong done." '

So-called '*Bivens* actions' for money damages against federal officers have subsequently been permitted under § 1331 for violation of the Due Process Clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 [99 S.Ct. 2264, 60 L.Ed.2d 846] (1979), and the Cruel and Unusual Punishment Clause of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 [100 S.Ct. 1468, 64 L.Ed.2d 15] (1980). In each of these cases, as in *Bivens* itself, the Court found that there were no 'special factors counselling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy.

Our more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts. The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation. Thus, in *Chappell v. Wallace*, 462 U.S. 296 [103 S.Ct. 2362, 76 L.Ed.2d 586] (1983), we refused—unanimously—to create a *Bivens* action for enlisted military personnel who alleged that they had been injured by the unconstitutional actions of their superior officers and who had no remedy against the Government itself....

. . . .

See also *United States v. Stanley*, 483 U.S. ——, —— [107 S.Ct. 3054, 3062, 97 L.Ed.2d 550] (1987) (disallowing *Bivens* actions by military personnel 'whenever the injury arises out of activity "incident to service" ').

Similarly, we refused—again unanimously—to create a *Bivens* remedy for a First Amendment violation 'aris[ing] out of an employment relationship that is governed by comprehensive procedural and substantive provisions given meaningful remedies against the United States.'

*Bush v. Lucas*, 462 U.S. 367, 368 [103 S.Ct. 2404, 2406, 76 L.Ed.2d 648] (1983).

. . . .

In sum, the concept of 'special factors counselling hesitation in the absence of affirmative action by Congress' has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id.* 108 S.Ct. at 2466–68 (some citations omitted). In *Chilicky*, the Court held that the improper denial of Social Security disability benefits allegedly resulting from due process violations by the petitioners in their administration of the continuing disability review program could not give rise to a *Bivens* action.

■ Of the *Bivens* actions considered by the Supreme Court, the instant case is most similar to *Carlson v. Green*. In that case, a *Bivens* action was brought against federal prison officials for violation of a prisoner's eighth amendment rights. The Court permitted a *Bivens* action in that context, reasoning as follows:

First, the case involves no special factors counselling hesitation in the absence of affirmative action by Congress. Petitioners do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate. *Davis v. Passman*, [442 U.S. 228, 246 [99 S.Ct. 2264, 2277, 60 L.Ed.2d 841] (1979) ]. Moreover, even if requiring them to defend respondent's suit might inhibit their efforts to perform their official duties, the qualified immunity accorded them under *Butz v. Economou*, 438 U.S. 478 [98 S.Ct. 2894, 57 L.Ed.2d 895] (1978), provides adequate protection. See *Davis v. Passman*, [442 U.S. at 246, 99 S.Ct. at 2277].

Second, we have here no explicit congressional declaration that persons injured by

federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress. Petitioners point to nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations.

*Carlson v. Green,* 446 U.S. at 19, 100 S.Ct. at 1472. This rationale applies with equal force to the instant case. Therefore, we hold that federal courts have the jurisdictional authority to entertain a *Bivens* action brought by a federal prisoner, alleging violations of his right to substantive due process, and, consequently, that we have authority to consider this appeal.

### B.

 Initially, appellant argues that the district court violated the doctrine of law of the case when Judge LaPlata granted appellee Wahl's third motion for summary judgment after Judge Joiner had denied two similar motions. We reject this argument.

Unlike the more precise requirements of res judicata, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.[8] Law of the case directs a court's discretion, it does not limit the tribunal's power.

[8] Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice.

*Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (citations omitted). *Cf.* Fed.R.Civ.P. 54(b) (stating that an order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties).

[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. In applying these grounds for reconsideration, it may prove proper to draw distinctions that rest on the stage that that proceeding has reached. Early pretrial rulings, for example, may often be subject to reconsideration as a case progresses toward trial....

....

... A wide degree of freedom is often appropriate when the same question is presented to different judges of a single district court. To be sure, unfettered reexamination would unduly encourage efforts to shop rulings from one judge to another, and might seem an undesirable denial of comity between colleagues, Substantial freedom is desirable nonetheless, particularly since continued proceedings may often provide a much improved foundation for deciding the same issue. Thus it has often been ruled that denial of a motion for summary judgment by one judge does not foreclose grant of summary judgment by another judge, and other preliminary matters are often reopened.

18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478 pp. 790–95 (1981) (footnotes omitted).

In *Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 134 (2d Cir.), *cert. dismissed,* 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956), the Second Circuit faced a question similar to that presented in the instant case: "[W]hether Judge Ryan was so bound to follow Judge Weinfield's denial of the defendants' motion for summary judgment that we must reverse his summary judgment on the merits without considering whether it was right: that is, whether the denial had become 'the law of the case,' and must be accepted thereafter without re-examination." The Second Circuit answered this question in the negative. Judge Learned Hand reasoned for the court as follows:

No one will suggest that the first judge himself may not change his mind and

overrule his own order, so that the basis of the doctrine can only be that there are reasons why the second judge may not do so that do not exist when the first does. We can think of only two such reasons: (1) the second judge should defer to the rule of the first as a matter of mutual respect between members of the same court; (2) if he does not so defer, the defeated party may shop about in the hope of finding a judge more favorably disposed. The first reason is clearly untenable: judicial sensibilities should play no part in the disposition of suitors' rights. The second reason has indeed much to recommend it, and, as a matter of practice, has been universally regarded a sufficient reason for treating the first ruling as conclusive. It is, however, quite another question whether under all circumstances it makes the first ruling immune from reconsideration.

*Id.* at 134–35.

The Second Circuit reconsidered and reaffirmed its holding in *Dictaphone Products Co.* in *Corporacion De Mercadeo Agricola v. Mellon Bank International*, 608 F.2d 43, 48 (2d Cir.1979):

In *Dictograph Products Company v. Sonotone Corporation*, 230 F.2d 131 (2nd Cir.1956), we set forth the standard which governs consideration of [a renewed motion for summary judgment before a second judge]. We held that on a renewed motion for summary judgment before a second judge, the district court must balance the need for finality against the forcefulness of any new evidence and the demands of justice. With respect to a non-appealable denial of summary judgment, the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court. The first judge always has the power to change a ruling; further reflection may allow a better informed ruling in accordance with the conscience of the court. *A fortiori*, if the first judge can change his mind after denying summary judgment, and change his ruling, a second judge should have and does have the power to do so as well.

*See also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 251 (D.C.Cir.1987) (holding that a subsequent motion for summary judgment based on an expanded record is always permissible); *United States v. Horton*, 622 F.2d 144, 148 (5th Cir.1980) (holding that the trial court properly reconsidered the motion for summary judgment because the production of reports, admissions, affidavits, and other record material during the course of proceedings had clarified and resolved questions of material fact on several issues). *Cf. Amen v. City of Dearborn*, 718 F.2d 789, 793–94 (6th Cir.1983) (law of the case doctrine is not so rigid as the rule of res judicata; there is a well-recognized exception that the doctrine must yield to an intervening change in controlling law; the law of the case doctrine does not foreclose reconsideration of subject-matter jurisdiction).

In the instant case, appellant stresses that the district court's grant of summary judgment was improper because the only new evidence considered by the district court was Cale's affidavit. We need not decide whether the new evidence considered by the district court meets some threshold test of sufficiency, however, as the Second Circuit has made clear. The district court does not have to rely on new evidence; if the demands of justice require, it may simply change its mind. Thus, we turn to the substantive question in this appeal, i.e., whether appellant has raised a genuine issue of material fact concerning a violation of his right to substantive due process which can be redressed through *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

### C.

■ Appellant argues that the district court erred in granting summary judgment in this case by holding that appellee Wahl's abuse of his authority as a prison official to plant illegal drugs on appellant, a prison inmate, for retaliatory purposes did not violate appellant's substantive due process rights. We agree.

The general standard an appellate court applies in reviewing a grant of summary judgment is the same as the district court employs initially under Federal Rule of Civil Procedure 56(c). *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2716 (1983). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez,* 826 F.2d at 1536.

In *McMaster v. Cabinet for Human Resources,* 824 F.2d 518 (6th Cir.1987), former state employees brought a civil rights action, claiming violation of substantive due process through malicious prosecution. This court summarized its position with respect to malicious prosecution-type substantive due process claims as follows:

> The test for substantive due process claims is whether defendants' conduct 'shocks the conscience.' *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). We have previously measured section 1983 malicious prosecution claims by this standard. *E.g., Vasquez v. City of Hamtramck,* 757 F.2d 771, 773 (6th Cir.1985). Where we have recognized a possible section 1983 claim, the circumstances have uniformly involved situations of arrest, incarceration, or charges of violation of non-traffic laws. Also, the courts that have recognized that malicious prosecution may support a section 1983 claim are virtually unanimous in holding that constitutional protection exists only with respect to criminal proceedings and not to civil proceedings.
>
> In the past, we have declined to recognize a section 1983 claim analogous to malicious prosecution where the plaintiff was never 'in danger of imprisonment.' *Vasquez, supra,* 757 F.2d at 773 (allegation of police harassment for issuance of traffic citations)....
>
> Because plaintiffs were never subjected to the possibility of incarceration, they failed to state a claim for violation of substantive due process. Dismissal [from employment with a state agency] simply does not 'shock the conscience.' We do not believe Congress intended section 1983 to apply to every claim of dismissal from employment without probable cause, at least where plaintiffs can point to no other invidious reason for their dismissal, such as race or political beliefs or other status or conduct protected by the Constitution or federal statutes.

*Id.* at 522–23 (some citations omitted).

In one case not cited by the court in *McMaster,* however, this court has recognized that an "egregious abuse of governmental power" may be sufficient to state a claim based on the violation of substantive due process. *Vinson v. Campbell County Fiscal Ct.,* 820 F.2d 194, 201 (6th Cir.1987). In *Vinson,* this court reasoned as follows: "The substantive component of the due process clause 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them [and thereby] serves to prevent governmental power from "being used for purposes of oppression." '" *Id.* In that case, a mother whose children had been removed from her custody in Ohio by a Kentucky juvenile services probation officer brought a civil rights action against the probation officer alleging, *inter alia,* a violation of substantive due process. The probation officer's alleged unlawful, malicious, and intentional deprivation of the mother's liberty interest in custody of her children was an egregious abuse of governmental power sufficient to state a claim based on substantive due process.

The instant case is distinguishable from *McMaster* and *Vasquez* because in the instant case appellant was in danger of further loss of liberty through disciplinary de-

tention and through the loss of good-time credit as the result of the charges filed against him. Furthermore, this case is distinguishable from *McMaster* because in the instant case appellees allegedly framed appellant in retaliation for exercising his first amendment right to register a complaint about the food.

However, the question remains whether appellees' alleged conduct constitutes an "egregious abuse of governmental power" within the meaning of *Vinson*. As the magistrate observed, there is a factual dispute as to whether Persky planted the marijuana, and there are circumstances which raise a question concerning Wahl's involvement in framing appellant. For example, Mikko Peterson, cook foreman, related in an internal memorandum concerning this incident, which was filed in the district court, and again in a deposition that on the morning of the incident Wahl told Fevurly that he was going to have Cale locked up and that that would be the end of Cale's complaints. Wells recalled in an interview concerning the incident that at the noon meal on that day Wahl told Wells that he would need to be available to go to the dining room at approximately 3:00 p.m. Thus, the evidence supports a claim that Wahl intentionally and maliciously framed Cale and filed disciplinary charges against him in retaliation for Cale's exercise of his first amendment rights. This alleged conduct constitutes an egregious abuse of authority within the meaning of *Vinson*.

Our conclusion is bolstered by recent holdings in other circuits. For example, in *Franco v. Kelly*, 854 F.2d 584 (2d Cir.1988), the Second Circuit addressed the question "whether an allegation that state prison officials intentionally filed false disciplinary charges against an inmate, in retaliation for the prisoner's exercise of a constitutional right, states a cause of action for damages under [section 1983] that can withstand a motion for summary judgment." The court answered this question in the affirmative. In that case, a prisoner alleged that a prison official's disciplinary report was part of a pattern of false disciplinary actions taken against him in retaliation for his cooperation with an investiga-

tion by the state Inspector General into reported incidents of inmate abuse. The prisoner alleged that he subsequently had been subjected to trumped up disciplinary charges resulting in confinement and a loss of privileges, and that he suffered physical abuse and threats by prison guards.

Additionally, the Eighth Circuit recently has held that a prisoner stated a claim based on substantive due process under the following circumstances:

> The complaint states that Sgt. Livingston pointed a lethal weapon at the prisoner, cocked it, and threatened him with instant death. This incident occurred immediately after the prisoner had given testimony against another guard in a § 1983 action. The death threat was accompanied by racial epithets which strongly suggest that the prisoner would have been treated differently had he not been black. Apparently, another guard who was present took the threat seriously enough to step between the prisoner and Sgt. Livingston. In case the point had not been made, Sgt. Livingston repeated the performance moments later. According to the uncontroverted words of the complaint, there was no provocation for the guard's action other than the prisoner's attempting to exercise his due-process and First Amendment right of access to the federal courts. The complaint describes in plain words a wanton act of cruelty which, if it occurred, was brutal despite the fact that it resulted in no measurable physical injury to the prisoner. The day has passed when an inmate must show a court the scars of torture in order to make out a complaint under § 1983. We hold that a prisoner retains at least the right to be free from the terror of instant and unexpected death at the whim of his allegedly bigoted custodians.

*Burton v. Livingston*, 791 F.2d 97, 100 (8th Cir.1986).

The instant case is similar to *Franco*. Appellant alleges that in retaliation for appellant's complaint about the food a federal prison official framed him by instructing another inmate to plant narcotics on him

and by then filing false disciplinary charges. Appellant was subject to the possibility of disciplinary sanctions and a resulting loss of liberty as a consequence of the alleged actions. Moreover, we agree with the court in *Burton* that an inmate need not show a court the scars of torture in order to make out a complaint under section 1983.

For the foregoing reasons, the district court's judgment is REVERSED, and this case is REMANDED for further proceedings.

DAVID A. NELSON, Circuit Judge, concurring.

I agree that this case ought to be remanded, but my reasons for thinking so differ somewhat from those of my colleagues.

As a prison official, Food Service Administrator Wahl surely had no authority to cause illegal drugs to be planted on the person of a prison inmate for any purpose at all, retaliatory or otherwise. Whether the alleged frame-up was prompted by pique at inmate Cale's critique of Wahl's menu, or by animosity stemming from dislike of Mr. Cale's looks, or race, or personality or whatever, Wahl had absolutely no business trying to make it appear that the inmate was guilty of an infraction of which he was innocent.

This poses a problem for the plaintiff in a *Bivens* action, as opposed to the sort of tort action that could doubtless have been brought in a state court under state law. The *Bivens* decision, as Mr. Cale correcly observed in his *pro se* complaint, held that federal employees may be sued for violating people's *constitutional* rights. Federal constitutional law has a narrower sweep, of course, than state tort law does. Both of the constitutional rights that Mr. Cale is talking about in this case—the Eighth Amendment right not to be subjected to cruel and unusual punishment, and the

Fifth Amendment right not to be deprived of life, liberty or property without due process of law—exist because of constitutional prohibitions against improper actions performed under color of governmental authority, and only under color of such authority. The Constitution does not prevent Food Service Administrator Wahl from going home at night and inflicting cruel and unusual punishment on his wayward child, or arbitrarily depriving the child of liberty, when the man is acting in his role as parent and not in his role as prison official. Nor does *Bivens* give the child a federal cause of action in such a situation; a cause of action for damages consequent upon unconstitutional conduct arises, under *Bivens*, when there is a violation of a constitutional command "by a federal agent *acting under color of his authority....*" *Bivens*, 403 U.S. 388, 389, 91 S.Ct. 1999, 2001, 29 L.Ed.2d 619 (1971). (Emphasis supplied.)[1] When the federal agent is not acting under color of his governmental authority, his conduct, however heinous, is simply not unconstitutional.

One of the several hurdles confronting Mr. Cale in this case, therefore, is to show that when Administrator Wahl had the marijuana planted, if that is what he did, he was acting under color of his authority as a federal employee. One possible way of surmounting that hurdle would be to show that Wahl's act was not an isolated incident, but was part of a pattern of misconduct so pervasive as to be suggestive of governmental action, as opposed to purely private action. That seems to be precisely what was alleged in *Franco v. Kelly*, 854 F.2d 584, 586 (2d Cir.1988), where the plaintiff claimed that the filing of false disciplinary charges against him, with the result that he was placed in confinement for 30 days, "was part of a *pattern* of false disciplinary actions taken against him in retaliation for his cooperation with an investigation...." (Emphasis supplied.)

---

1. Inmate Persky, who allegedly planted the marijuana under Wahl's direction, was not a federal agent himself, of course, but it is not inconceivable that he was acting under color of a federal agent's authority *qua* federal agent. Compare *Nishiyama v. Dickson County, Tennessee*, 814

F.2d 277 (6th Cir.1987) (en banc), where we held that a state prisoner, although not an agent of the state, could have been acting under color of state law, for purposes of 42 U.S.C. § 1983, at the time he committed a brutal murder.

In moving for summary judgment in this case, defendant Wahl made no effort to demonstrate that the planting of the marijuana, if it occurred, was an isolated incident rather than part of a more pervasive pattern of misconduct. That the supposed frameup may have been part of a congeries of similar acts is suggested by the summary judgment order itself; in that order the district court tells us that "defendant Wahl was subsequently investigated for numerous wrongdoings and discharged from his employment with F.C.I. [Federal Correctional Institute] Milan."

We cannot tell, at this point, how much the government knew about Wahl's behavior before the alleged set-up of Mr. Cale. Maybe the government ought to have fired Wahl long before the purported planting of the marijuana. In any event, I am not prepared to say, on the present record, that Wahl and Persky may not have been performing their roles, in the drama that has been described to us, as government actors rather than as bad actors of a purely private sort.

Assuming then, as I think one must, that plaintiff Cale may be able to show that defendants Wahl and Persky acted under color of government authority, one comes to the question whether their presumed governmental actions could have violated the commandments of the Fifth or Eighth Amendments.

As to the latter, it seems reasonably clear, for several of the reasons spelled out by Judge Friendly in *Johnson v. Glick*, 481 F.2d 1028, 1031 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), that our case, like that one, "does not lie comfortably within the Eighth Amendment." The text of the amendment, as Judge Friendly noted, "suggests action taken, usually by a court, in carrying out a legislative authorization or command." *Id.* Although the prohibition against cruel and unusual punishment may also apply to the manner in which an otherwise constitutional sentence is carried out, there cannot be a violation without "punishment," and the punishment must have been "deliberately administered for a penal or disciplinary purpose, with the apparent authorization of high prison officials charged by the state with responsibility of the state for the care, control, and discipline of prisoners." *Id.* at 1032. Thus a spontaneous physical attack by a prison guard against an inmate "does not fit any ordinary concept of 'punishment,'" Judge Friendly said, notwithstanding the punitive intent of the guard himself. *Id.*

Food Service Administrator Wahl may well have had a punitive intent in causing the marijuana to be planted, if that is what happened, but the hypothesis has to be that he intended to punish the criticism of his menu, not the violation of a federal statute. The affidavits filed in this case establish without contradiction that as far as the high officials in charge of running the prison are concerned, the placing of an inmate in administrative detention status while the inmate is under investigation for possession of drugs is a standard prison practice that is prophylactic in nature, not punitive. Plaintiff Cale's able appellate counsel as much as conceded, during oral argument, that the Eighth Amendment claim is not viable, and I am inclined to agree with him. I assume my colleagues are too.

Where I may have a fundamental difference with my colleagues is in the analysis of Mr. Cale's Fifth Amendment claim. If the claim is simply that Food Service Administrator Wahl committed an abuse of governmental power so "egregious" that it "shocks the conscience" and therefore violated Mr. Cale's "right to substantive due process," it seems to me that the claim may not lie any more comfortably within the text of the Fifth Amendment than it does within the text of the Eighth Amendment.

The Fifth Amendment does not say "No person shall be deprived of substantive due process." It says, rather, that no person shall be deprived of "life, liberty or property," except by due process of law. What Mr. Wahl is alleged to have done here obviously did not deprive Mr. Cale of his life or his property, so the question that the district court ought to have addressed, I

believe, is whether Mr. Wahl's conduct as a putative government actor could possibly be shown to have deprived Mr. Cale of his "liberty" without due process of law.

We do not know how the district court would answer that question, because the court merely told us that its conscience was not "shocked" by what happened. Not all consciences cringe at the same conduct, of course, and my colleagues may be easier to shock than the district court was. The "shocks the conscience" test "is not one that can be applied by a computer," as Judge Friendly rather delicately put it in *Glick*, 481 F.2d at 1033, and as for me, I am frank to say that the shock threshold of any individual judge, like the length of any individual chancellor's foot, is a question that interests me less than the one I think the district court ought to have addressed here, but didn't.

It is possible, for all I know, that the district court might have been able to conclude, under the facts of this case, that Mr. Cale did indeed have a constitutionally protected "liberty interest" in remaining in the general prison population, rather than being put in administrative segregation for three days. The United States Supreme Court has said, after all, that the prison regulations of the Commonwealth of Pennsylvania may give a Pennsylvania prisoner "a [constitutionally] protected liberty interest in remaining in the general prison population." *Hewitt v. Helms*, 459 U.S. 460, 470–71, 103 S.Ct. 864, 870–71, 74 L.Ed.2d 675 (1983). The Court was speaking there of an inmate who had been placed in administrative segregation for a period of five days. Whether, on the facts presented, a difference of two days would be enough to differentiate the instant case from *Hewitt v. Helms*, I do not know. (See *Vasquez v. City of Hamtramck*, 757 F.2d 771, 773 (6th Cir.1985), where we declined to give a constitutional dimension to acts of "petty harassment" by a state agent. Compare *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), where a negligent detention of the plaintiff for three days was held not to have deprived him of liberty without due process of law.) The observations of the district court, more familiar with the facts than I, would have been helpful on this point.

If Mr. Cale did have a constitutionally protected "liberty interest" in remaining in the general prison population—and it is hard for me to believe that the prison regulations in effect at the Milan FCI authorized the placement of inmates in administrative segregation on the strength of false evidence purposely manufactured by the government—and if the government actually set Mr. Cale up for administrative segregation in the way that he claims, I would conclude that he was indeed deprived of his liberty without the minimal process that is due in the prison context.

My conclusion might be difficult to reconcile with *Freeman v. Rideout*, 808 F.2d 949 (2d Cir.1986), *reh. denied*, 826 F.2d 194 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988), where the filing of unfounded administrative charges against an inmate was held not to violate due process as long as the charges were subsequently adjudicated in a fair hearing. There may be a meaningful difference, however, between triggering administrative disciplinary proceedings by openly filing charges that ultimately prove to be unfounded or false, and triggering such proceedings by surreptitiously planting contraband on an inmate's person or in his cell. *Hanrahan v. Lane*, 747 F.2d 1137 (7th Cir.1984)—a case decided *per curiam* without argument—suggests that even the planting of contraband poses no due process problem. I disagree.

I realize that the exigencies of the prison situation sometimes require prison officials to act quickly and informally, and courts should be very slow indeed to equate informality with unconstitutionality. But if Mr. Cale's account of the facts is true, there was no conceivable justification for the manner in which Mr. Cale's removal from the general prison population was effected by Mr. Wahl. For the government know-

ingly to railroad someone into confinement by planting false evidence on his person is directly comparable, by my lights, to railroading a person into confinement through a kangaroo court proceeding in which the accused has no opportunity to be heard. Both procedures strike me as the very antithesis of "due process" in the true sense of that term.[2]

Rather than telling the district court that its conscience ought to have been shocked by Mr. Cale's story, I would have asked the court to determine whether defendants Wahl and Persky, acting under color of governmental authority, did in fact deprive Mr. Cale of liberty without due process of law.

---

**2.** *Murray's Lessee v. Hoboken Land and Improvement Co.,* 18 How. 272, 276, 15 L.Ed. 372 (1856), a decision cited with approval in *Daniels v. Williams,* 474 U.S. 327, 332–33, 106 S.Ct. 662, 665–66, 88 L.Ed.2d 662 (1986), tells us that what was originally meant by "due process of law," as used in the Fifth Amendment, was what Lord Coke, in his famous commentary on *Magna Charta,* said was conveyed in the latter document by the phrase "by the law of the land." That phrase appears in a chapter (Chapter 29) of *Magna Charta* that may be translated as follows:

"No free man shall be taken, or imprisoned, or disseised of his free tenement, or liberties, or his free customs, nor shall he be outlawed, or exiled, or in any way destroyed, nor will we go upon him, nor will we send upon him, but *by the lawful judgment of his peers, or by the law of the land.* To none will we sell, to none will we deny, or delay justice, or right." (Emphasis supplied.) As quoted (in Latin) at Coke, 2d Inst., 45.

Coke begins his exegesis of the phrase "but by the law of the land" as follows:

"For the true sense and exposition of these words, see the Statute of 37. E.3.cap.8, where the words, by the law of the Land, are ren-

dered, without due process of Law...." *Id.* at 50.

A few pages later, still on the same subject, Coke remarks that "if any man by colour of any authority, where he hath not any in that particular case, arrest, or imprison any man, or cause him to be arrested, or imprisoned, this is against this Act, and it is most hatefull, when it is done by countenance of Justice." *Id.* at 54.

Coke's Institutes were a staple of 18th Century legal learning, of course, and it is far from unreasonable to suppose that the Fifth Amendment's prohibition against deprivation of liberty "without due process of law" was intended to be broad enough to cover the "hatefull" case of the man who, acting by color of an authority he does not possess, causes another to be arrested or imprisoned wrongfully. Our forebears might well have had difficulty with the concept that it is possible for a person to be wrongfully deprived of liberty after his liberty has already been taken away by lawful imprisonment, but that difficulty need not concern us; the Supreme Court has made it clear that some prisoners, at least, retain a measure of liberty that the Constitution protects even after the prison gates have clanged shut on them.