94 F.3d 644
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Tanaka Lee BIRDO, Plaintiff-Appellant,
v.
Ernest D. SMITH, Senior Captain, Eastern Kentucky
Correctional Complex, et al.,
Defendants-Appellees.*
 No. 95-5970.
 United States Court of Appeals, Sixth Circuit.
 Aug. 13, 1996.
 
 Before: JONES, BOGGS, and COLE, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Plaintiff Tanaka Lee Birdo appeals the district court's award of summary judgment to Defendants in this civil rights action. On appeal, he asserts that the district court erred by misapplying the relevant law, by not recognizing genuine issues of material fact, by misinterpreting the allegations of his Complaint, and by prematurely dismissing a Defendant. We agree with the first three assignments of error, and therefore we reverse and remand this case for further proceedings.
 
 I. Facts
 
 2
 Birdo is a Black Muslim inmate at the Eastern Kentucky Correctional Complex. From February 1992 to August 1992 Birdo wrote and forwarded letters to the F.B.I., the Governor, a State Senator and Representative, the Kentucky Justice Department, a newscaster, the Commissioner of Corrections, the Deputy Warden, the Chaplin, Internal Affairs Officer Lt. Timothy Thornsberry, and Warden Michael O'Dea, complaining of various allegedly unsatisfactory prison conditions, including religious and race persecution against Black and Muslim inmates. Moreover, he complained about Lt. Earl Wagers' treatment of a certain prisoner. See Birdo's Br. at 3-10; J.A. at 96-100. Also, on March 6, 1992, Birdo and sixteen other prisoners initiated a § 1983 action against prison officials, alleging discriminatory treatment of Black Muslim prisoners with respect to religious accommodation, freedom of expression, hiring, and discipline.
 
 
 3
 On August 11, 1992, Correction Officer (C.O.) John Stewart conducted a "routine shakedown" of Birdo's cell. As a result of the search, he recovered a "diary" (four sheets of paper and the cardboard back of a legal pad, see J.A. at 102-06), and other effects in Birdo's cell that presumably piqued some concern. C.O. Stewart contacted his shift supervisor, who in turn dispatched Lt. Ellen Compton. Allegedly "at a glance," Lt. Compton concluded that the papers were inflammatory. She then confiscated them and issued a receipt to Birdo. The next day, Lt. Compton forwarded the papers to Sr. Capt. Ernest Smith for review. Capt. Smith conferred with Lt. Thornsberry who already had copies of several of Birdo's letters in his possession, which Birdo had sent to him. Based on the content of the letters and the diary found in the cell, Capt. Smith and Lt. Thornsberry agreed that Birdo should be confined in segregation, which is known as the "hole." Capt. Smith ordered that Birdo be placed in the hole and on August 14, 1992, Lt. Thornsberry issued a disciplinary report stating that Birdo was confined "for attempting to incite a riot because of the inflammitory [sic] nature of the documents, Birdo's behavior, and comments." J.A. at 107.
 
 
 4
 Lt. Thornsberry's brother-in-law, Lt. Wagers, who was the subject of complaints in Birdo's letters, investigated the disciplinary report that same day and talked to Birdo, who admitted writing the letters and diary. Birdo, however, refused to give a "statement." Lt. Wagers formally charged Birdo with violation of institutional rules--Inciting to Riot or Rioting--including, "attempts to the commit the offense," and "facilitating the actions of another or others in committing the offense." On August 18, 1992, Warden O'Dea, who was out of town when the decision was made to put Birdo in the hole, interviewed Birdo, determined that he was not a security risk and ordered his release from segregation the next day. Later, upon review by the Prison Adjustment Committee on August 20, 1992, the charges were dismissed. Birdo was confined in the hole for a total of five days.
 
 II. Procedural History
 
 5
 On January 20, 1993, Birdo filed a pro se Complaint under 42 U.S.C. § 1983 against eight officials of EKCC (Warden O'Dea, Capt. Smith, Lt. Thornsberry, Lt. Wagers, Lt. Compton, Lt. Caudill, Lt. Carroll, and C.O. Stewart), alleging that the officials violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Specifically, Birdo complained that the Defendants deprived him of: (1) his First Amendment right to free exercise of religion by summoning him from his prayers to answer the charge of Incitement to Riot; (2) his Eighth Amendment protection against cruel and unusual punishment by denying him a dental appointment and daily exercise while in segregation and exposing him to cold air, thus aggravating his medical problems; and (3) his Fourteenth Amendment due process rights by not having a superior officer present during the search of his cell, by confining him in segregation and confiscating his property through a retaliatory conspiracy, and by not providing a fair and impartial investigation of the riot charges. J.A. at 12-20.
 
 
 6
 After his initial review of Birdo's pro se complaint pursuant to 28 U.S.C. § 636(b)(1)(B), the magistrate judge recommended that the entire action be dismissed sua sponte. J.A. at 30. On April 30, 1993, Birdo objected to the magistrate judge's Report and Recommendation in what he styled an "Answer," explaining that he intended to allege that Defendants denied him substantive due process by retaliating against him for exercising his First Amendment rights of access to the courts and free speech, as well as clarifying that the Defendants' actions also amounted to a direct violation of those First Amendment rights. Birdo additionally suggested that the charge against him was fabricated because the material seized from him did not support the allegation that he was planning a riot. On May 21, 1993, the district court dismissed the First and Eighth Amendment claims, but not the Fourteenth Amendment claim, finding "nothing in the objections that disturb[ed] the report and recommendation with regard to the First and Eighth Amendment claims, but [finding] merit in Plaintiff's objection to dismissal of the Fourteenth Amendment claims." J.A. at 39. Further, the district court dismissed Warden O'Dea, Lt. Caudill, and Lt. Carroll as Defendants.
 
 
 7
 On October 18, 1993, the remaining Defendants--Capt. Smith, Lt. Thornsberry, Lt. Wagers, Lt. Compton, and C.O. Stewart--moved for summary judgment, arguing that the case lacked genuine issues of material fact and that they were entitled to judgment as a matter of law. Birdo responded pro se, indicating that his Fourteenth Amendment claims were valid, and that genuine issues remained with respect to whether a legitimate security concern existed and whether the officers' action of placing him in segregation was in retaliation for his exercise of constitutional rights.
 
 
 8
 The magistrate judge reviewed the motion and response, and in his March 15, 1994 Report and Recommendation found summary judgment appropriate on all but one of Birdo's remaining Fourteenth Amendment claims. He recommended, however, that Birdo be allowed to proceed with his Fourteenth Amendment substantive due process claim, which alleged that Defendants conspired against him in retaliation for exercising his First Amendment rights.
 
 
 9
 The district court adopted the magistrate judge's Report and Recommendation, granting the summary judgment motion except as to Birdo's Fourteenth Amendment retaliation claim. The court appointed counsel to pursue Birdo's remaining claim, and after discovery, the Defendants submitted a supplemental motion for summary judgment on March 24, 1995. On June 13, 1995, the district court granted the motion and dismissed the case in its entirety, finding that great deference must be given to prison administrators in implementing internal security procedures. Given that deference, the court ruled that the informal nonadversarial review of the detention order, which provided Birdo with the opportunity to comment, was legally sufficient. J.A. at 91 (citing Hewitt v. Helms, 459 U.S. 460 (1983)). The court also held that,
 
 
 10
 [t]he precautionary steps taken against Plaintiff were justified on the basis of the information contained in documents acknowledged by Plaintiff to belong to him regarding the location of various staff on the yard, rumors that a riot was to occur between blacks and whites within the institution, and in light of the procedures that were followed which resulted in Plaintiff's speedy release from administrative segregation and eventual absolution by the Disciplinary Adjustment Committee.
 
 
 11
 Id. at 92. Birdo appeals this final order granting summary judgment.
 
 III. Discussion
 
 12
 "We review a district court's grant of summary judgment de novo.... [I]n a motion for summary judgment, 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' " Russo v. City of Cincinnati, 953 F.2d 1036, 1041-42 (6th Cir.1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and citing Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 534 (6th Cir.), cert. denied, 498 U.S. 940 (1990)). Summary judgment is appropriate only when the record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Entry of summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 A. Applicable Law
 
 13
 Birdo first argues the district court erred by finding that Defendants were entitled to summary judgment as a matter of law with respect to his claim of retaliatory detention. In reaching its conclusion, the court observed the deference accorded to prisons under Bell v. Wolfish, 441 U.S. 520 (1979), to maintain institutional security. The district court then relied on Hewitt v. Helms, 459 U.S. 460 (1983), to find that Defendants' placing Birdo in segregation was not violative of Birdo's limited liberty interest protected by the Due Process Clause in remaining in the general prison population. The district court reasoned that Defendants had a valid interest in maintaining security and Birdo was afforded the only process he was due. The Defendants cite the Court's decision in Sandin v. Conner, 115 S.Ct. 2293 (1995), and our decisions in Rimmer-Bey v. Brown, 62 F.3d 789 (6th Cir.1995), and Ward v. Dyke, 58 F.3d 271 (6th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 524 (1995), as additional support for the district court's award of summary judgment. We are not persuaded, however, that these cases alter the applicability of this court's decision in Cale v. Johnson, 861 F.2d 943 (6th Cir.1988), to the facts of this case.
 
 
 14
 In Cale, this court held that a prisoner states a claim for violation of his substantive due process rights when he alleges that prison officials have engaged in " 'egregious abuse of governmental power.' " Id. at 949 (quoting Vinson v. Campbell County Fiscal Ct., 820 F.2d 194, 201 (6th Cir.1987)). Louis Cale was an inmate who complained about the poor quality of food at his prison. Cale alleged that in retaliation for his complaint, prison officials had drugs planted on him, placed him in segregation for four days, and brought disciplinary charges against him. The charges were later dismissed by a discipline committee, and it appeared that sufficient evidence existed to support Cale's allegations of wrongdoing. In reversing an award of summary judgment to the Defendants, this court reasoned that if proved, Cale's claim that he was framed in retaliation for complaining about poor food would amount to an egregious abuse of governmental power, shocking to the conscience. Id. at 950. Accordingly, summary judgment was inappropriate. Moreover, in a concurring opinion Judge Nelson specifically stated that if the facts alleging retaliation and setup were proved, the inmate "was indeed deprived of his liberty without the minimal process that is due in the prison context." Id. at 953 (Nelson, J., concurring).
 
 
 15
 Because Cale is applicable to the similar facts presented in this case, we find that the district court erred as a matter of law by limiting its analysis to the holdings in Helms and Bell. Further, as discussed infra, Sandin and Rimmer-Bey are inapposite. Indeed we recognize and respect that courts are required to give great deference to the actions of prison officials in managing the security of prisons. Further, we understand the holdings that the only process due a prisoner subject to "administrative segregation" pending an investigation into misconduct charges and a determination whether he is a security threat, is "an informal nonadversary evidentiary review." Helms, 459 U.S. at 476. Nonetheless, we note that the holding in Helms is limited to circumstances where the " 'conditions or degree of confinement ... is not otherwise violative of the Constitution.' " Id. at 468 (quoting Montanye v. Haymes, 427 U.S. 236, 242 (1976)). The "refinement" of the holding in Helms by the Court in Sandin does nothing to change that proposition.
 
 
 16
 In Sandin the court was faced with a prisoner's claim that he, inter alia, had been denied procedural due process because he was not permitted to present witnesses in his defense at a prison adjustment committee hearing. 115 S.Ct. at 2296. The court modified the approach promoted in Helms by looking beyond any type of interest created by state or prison regulations and thus limited prisoners' liberty interest to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause on its own force, nonetheless, imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 2300 (internal citations omitted). This court followed Sandin in Rimmer-Bey, holding that an inmate's placement into administrative segregation was not atypical and significant hardship within the context of his sentence, and therefore his right to procedural due process had not been violated. 62 F.3d at 791 (footnote omitted).
 
 
 17
 These cases, however, primarily concerned procedural due process claims, and focused on the severity of the punishment to address peripheral substantive due process considerations. See Rimmer-Bey, 62 F.3d at 791, n. 4. (record lacked evidence of conduct shocking to the conscience so as to support substantive due process claim). Quite a different concern is raised in a case such as this, where substantive due process violations are alleged due to intentional deprivation of constitutional rights. It appears that the district court limited its examination to the procedural process afforded to Birdo, without focusing on the alleged constitutional violation and retaliatory conduct. The instant case is not one of merely placing an inmate in administrative segregation for non-punitive reasons within the confinement ordinarily contemplated by a prison sentence, rather, it is a case in which violations of First Amendment and substantive due process rights of expression and freedom from retaliatory conduct are alleged, requiring the court to consider further those allegations. Cale dictates that the substantive component of the Due Process Clause bars certain government actions regardless of the fairness (or legal sufficiency) of the procedures used to implement them. 861 F.2d at 949 (citing Vinson, 820 F.2d at 201). The district court annexed, as additional rationale for its decision, that "completely absent from Plaintiff's Complaint were any allegations of physical brutality by prison officials." This fact unquestionably is irrelevant as this court has held the absence of physical brutality not to be a bar to a substantive due process claim. Cale, 861 F.2d at 951, (citing Burton v. Livingston, 791 F.2d 97, 100 (8th Cir.1986); see also Franco v. Kelly, 854 F.2d 584 (2d Cir.1988).
 
 
 18
 Accordingly, Defendants miss the mark when they characterize Birdo's claim as asserting a substantive due process violation based merely on his five day segregation, his being forced to miss a dental appointment, his one hour per day exercise restriction, and the interruption of his prayer. To the contrary, the gravamen of Birdo's complaint is his assertion of retaliation. As a consequence, summary judgment would be appropriate only if there exists no genuine issue of material fact regarding retaliation. If an analysis of the facts reveals that retaliation occurred, then Birdo's substantive due process rights may have been violated, as such retaliation could be construed as shocking to the conscience.
 
 B. Genuine Issues of Material Fact
 
 19
 Turning to the alleged facts of the instant case and drawing all justifiable inferences in favor of Birdo, we conclude that genuine issues of material fact exist which preclude summary judgment on Birdo's Fourteenth Amendment claim. Birdo asserts that the officers retaliated against him for writing letters by placing him in segregation as punishment. Conversely, the Defendants maintain that Birdo was placed in segregation because his letters and diary indicated that he posed a security threat and was attempting to incite a riot. Within these two contradictory positions lie many genuine and material factual disputes.
 
 
 20
 For example, Birdo's "diary," which was determined "at a glance" to contain material creating security concerns, appears to this court to be nearly impossible to read even after considerable concentration, let alone "at a glance." Further, the legible portions contained nothing more than entries similar to a morning log kept in the military, which a trier of fact could find impossible to be thought of as seditious. Indeed, Lt. Thornsberry stated, "[the] diary indicates that Birdo is trying to maintain some type of file relating to racial conditions in order to substantiate his misconceptions." J.A. at 107. It is perfectly legitimate, however, for a prisoner who intends on filing a complaint or grievance to keep such a diary. Moreover, the personal observations in Birdo's diary, which was kept in his cell, apparently were not common knowledge among the prison population, thus limiting the likelihood that Birdo's diary observations could pose a threat to prison security.
 
 
 21
 Also, none of the Defendants' contemporaneous reports mentioned "rumors" of a potential riot; it was not until the discovery stage that the possibility of a riot was invoked as a justification. Capt. Smith's and Lt. Thornsberry's deposition testimony specifically intimates that they did not like the content of Birdo's complaints and letters, giving rise to the possibility that they would exaggerate their effect. In his deposition testimony, Capt. Smith responded affirmatively to the question, "[y]ou would consider, for example, that someone, who was complaining about what he perceived as discrimination, was a security risk." J.A. at 122. Further, in his report to the Deputy Warden, Capt. Smith explained that Birdo was placed in segregation for, inter alia, "making unfounded and unsubstantiat[ed] accusations against both security and non-security staff," finding that these "[accusations] caus[e] hate and discontent, creat[e] racial tension and [are] detrimental to the good and security of E.K.C.C." J.A. at 109. The letters upon which Smith and Thornsberry relied to charge Birdo with incitement to riot, however, were not addressed to any inmate, nor is there evidence that they were circulated throughout the prison population. Moreover, there is a bona fide question as to whether the contents of the letters, even when combined with the diary, give rise to valid security concerns.
 
 
 22
 If nothing else, these contrary arguments clearly exhibit genuine issues of material fact concerning whether the officers acted in retaliation against Birdo for his letter-writing campaign and civil lawsuits. If they did, regardless of his short stay in segregation and his allegedly de minimis inconvenience, Defendants' actions would be deemed an egregious abuse of authority and thus violative of Birdo's right to substantive due process under the Fourteenth Amendment. These questions of fact should not have been ignored in awarding summary judgment. A prison's entitlement to deference from the courts does not concurrently require the courts to ignore evidence of potentially deliberate unconstitutional action on the part of the prison, which, if proven, may demonstrate that the prison's security concerns were invalid or pretextual.
 
 C. First Amendment Claims
 
 23
 Birdo's third argument is that the district court erred in construing his First Amendment claim as simply an allegation of infringement on his religious freedom and thus dismissing it sua sponte. At the time the claim was dismissed, Birdo was proceeding pro se and in forma pauperis; therefore his Complaint should have been held to a less stringent standard than that imposed on those filed by attorneys. Haines v. Kerner, 404 U.S. 519 (1972). In this appeal, Birdo's argument appears to be that his First Amendment claim was not merely that he was denied attendance at religious services, but also that the Defendants' actions were designed to quash, inhibit or restrain his exercise of his First Amendment rights to free speech and access to the courts. While Birdo's Complaint alleged only a free exercise of religion claim, his "Answer (objections) to the Magistrate's Report," which the court used in sustaining Birdo's Fourteenth Amendment claim, likewise should have been used to sustain Birdo's allegation, highlighted in this "Answer," of deprivation of his First Amendment rights to free speech and access to the press and courts. This is particularly true given the nature and context of Birdo's objections.
 
 
 24
 Birdo stated, when referring to Nolan v. Fitzpatrick, "the court held that prisoners have a right to send letters to the press concerning prison management, treatment of offenders or personal grievances." J.A. at 35 (citing Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir.1971)). Nothing is more telling about Birdo's intended complaint than his citation to Nolan and other cases. Nolan was a case specifically involving prisoners' claims of deprivation of First Amendment rights by prison officials. Further, Birdo cited Procunier v. Martinez, 416 U.S. 396 (1974), overruled by Thornburgh v. Abbott, 477 U.S. 401 (1989), another case involving a prisoner's exercise of his First Amendment free speech rights. J.A. at 35-36. Although Procunier had been overruled, its citation illuminates the pro se Plaintiff's concern about the alleged violation of his First Amendment rights to free speech.
 
 
 25
 Later, in his objections, he stated that if there is a fear that communications with the courts will result in some risk, a prisoner may be deterred from exercising his right to communicate. J.A. at 37. He went on to state that "several courts have held it to be unconstitutional for prison officials to impose or threaten to impose punishment based upon a prisoner's complaints to the courts." Id. (citing Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Montanye, 547 F.2d 188 (2d Cir.1976)). These cases also implicate a prisoner's exercise of First Amendment freedoms other than religion. Accordingly, we find that the district court erred by dismissing Birdo's First Amendment claim, misconstruing it as only a claim involving free exercise of religion. While we express no opinion on the potential for success of this claim, we note that Birdo's placement in segregation for five days, if it were proved to be the result of unconstitutional punishment, could moderate his passion for filing grievances in the future. The Supreme Court has "unequivocally admonished that even minimal infringement upon first amendment values constitutes irreparable injury...." Newsom v. Norris, 888 F.2d 371, 378 (6th Cir.1989) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)). Sua sponte dismissal simply was improper.
 
 
 26
 Defendants note that at no point after Birdo was represented by counsel was an amended "answer" tendered clarifying this claim. Defendants' point is irrelevant. It was the duty of the court to liberally construe Birdo's complaint and objections as they were submitted pro se. The court fulfilled that duty when it read into Birdo's Complaint, Birdo's due process retaliation claim as "clarified" in his objections to the Report and Recommendation. Within those same objections, the court could have recognized Birdo's manifest First Amendment claim. The magistrate judge in fact acknowledged the validity and relevance of the cases cited by Birdo on that issue.
 
 
 27
 Of course pro se plaintiffs are not automatically entitled to take every issue to trial; the lenient treatment generally accorded to pro se litigants has limits. Jourdan v. Jabe, 951 F.2d 108, 110 (6th Cir.1991). In this case, however, we find that the court should have acknowledged the underlying First Amendment issue and a subsequent court-appointed counsel's compounding failure to point it out to the court does not vitiate the court's responsibility in that regard.
 
 
 28
 The district court properly dismissed the free exercise of religion segment of Birdo's First Amendment claim; we find that the Defendants' removal of Birdo from prayer service did not give rise to a cognizable constitutional violation. The court, however, errantly failed to acknowledge the free speech and redress component of the First Amendment claim. We therefore reinstate Birdo's First Amendment claim as it relates to the alleged deprivation of free speech and access to the press and courts.
 
 D. Dismissal of Defendant O'Dea
 
 29
 Birdo's final argument is that the district court improperly dismissed Warden O'Dea as a Defendant. On appeal, he asserts that Warden O'Dea has implicitly condoned the other Defendants' actions and that Warden O'Dea has a policy of violating constitutional rights. See Birdo's Reply Br. at 13-18. Birdo, therefore, suggests that the dismissal of the warden before discovery was improper.
 
 
 30
 Birdo's claim that the warden was improperly dismissed as a party, however, has not been preserved for appeal. In his objections to the magistrate judge's Report and Recommendation, wherein all Defendants were recommended to be dismissed, Birdo failed to object to the recommended dismissal of Warden O'Dea. That failure precludes Birdo from now asserting that O'Dea was improperly dismissed. United States v. Walters, 638 F.2d 947, 949-50 (6th Cir.1981). Further, Birdo proceeded with this case before the district court against the remaining Defendants without disputing O'Dea's dismissal. In fact, in a pro se Pre-Trial Memorandum to the court, Birdo identified what he perceived as the specific constitutional violations perpetrated by the remaining Defendants. He stated, "Officer Stewart is liable for tearing up my letter ... and reading my legal mail.... Lt. E. Compton was liable by taking my diary.... Lt. Thornsberry & Capt. Ed Smith are liable [for] conspiring and having me placed in the segregation unit" and unjustly confiscating his legal papers, and "Lt. Earl Wagers is liable for not investigating this matter." J.A. at 43-44. In that memorandum, however, Birdo did not allege any liability on behalf of Warden O'Dea.
 
 
 31
 Even if we were to consider the dismissal of O'Dea, we would not agree with Birdo's assignment of error. The district court dismissed the warden, as well as other Defendants, early in the proceedings, finding that they had no direct involvement in the challenged actions. At no juncture, until this appeal, did Birdo suggest that Warden O'Dea's proposed relevance as a Defendant was based on anything other than respondeat superior. It is well settled that respondeat superior cannot serve as the sole basis for liability. Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir.), cert. denied, 469 U.S. 845 (1984). Further, Warden O'Dea was properly dismissed as a Defendant because he did not participate in Birdo's detention and upon his return, he released Birdo. Birdo simply has failed to assert a claim under which Warden O'Dea would be liable.
 
 IV. Conclusion
 
 32
 Based on the foregoing we REVERSE the district court's award of summary judgment as to Defendants Smith, Thornsberry and Wagers and REMAND the case to the district court for further proceedings consistent with this opinion, specifically focusing on the Fourteenth Amendment and First Amendment claims. We AFFIRM the dismissal of Defendant O'Dea.
 
 
 
 *
 The Defendant-Appellees named in this appeal are Senior Captain Ernest Smith, Lieutenant Timothy Thornsberry, Lieutenant Earl Wagers, and Warden Michael J. O'Dea. The Plaintiff-Appellant has attempted to introduce the Eastern Kentucky Correctional Complex ("EKCC") or Deputy Warden Allie Sharp for the first time in this appeal. We do not recognize EKCC and Dep. Warden Sharp as Defendant-Appellees because they were not parties to this case below. Further, an appeal was not taken as to the award of summary judgment to Defendants Lieutenant Ellen Compton and Correction Officer John Stewart; hence they are not Appellees before this court. See J.A. at 94 (notice of appeal); Birdo's Br. at 18