**Vaughn RODGERS, et al., Plaintiff,**

Ronald Irvin, Plaintiff–Appellant,

v.

John HAWLEY, Warden, et al.,
Defendant–Appellees.

Nos. 99–2219, 99–2311.

United States Court of Appeals,
Sixth Circuit.

June 22, 2001.

Before BOGGS and CLAY, Circuit Judges; GWIN, District Judge.*

GWIN, District Judge.

Ronald Irvin, an inmate at the Marquette Branch Prison, brought suit against

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

various prison employees under 42 U.S.C. § 1983. Proceeding pro se, Irvin alleged violations of his First Amendment right to send mail, to access the courts, and to be free from retaliation for accessing the courts. The district court granted summary judgment to the prison employees, a judgment Irvin now challenges on appeal. For the reasons set forth below, we AFFIRM the judgment of the district court.

## I

On March 12, 1996, several Marquette Branch Prison inmates filed this 42 U.S.C. § 1983 action in the United States District Court for the Western District of Michigan. Citing unsafe incarceration conditions, these inmates sued various prison employees for denial of their due process rights. On August 2, 1996, the inmates filed an amended complaint adding Ronald Irvin as a plaintiff and adding allegations that prison employees interfered with both prison mail and inmates' access to legal assistance.

The prison employees moved for summary judgment on the inmates' § 1983 claim. Irvin filed a separate response to this motion. In his response, Irvin specifically alleged that Gerard Kedzierzawski and David Kirkwood, both grievance coordinators at the Marquette Branch Prison, interfered with his attempts to grieve the conditions of his confinement. Irvin also alleged that Kedzierzawski and Kirkwood retaliated against him for attempting to pursue his grievances.

A federal magistrate judge recommended granting the prison employees' motion for summary judgment. The magistrate judge found no evidence to support the inmates' claim that the prison employees interfered with prison mail. As for

Irvin's allegations regarding interference with his right to access the courts, the magistrate judge observed that Irvin failed to allege any actual injury.

However, the magistrate judge noted that Irvin had not alleged retaliation in the second amended complaint. Thus, he concluded Irvin had not properly raised his retaliation claim. He recommended giving Irvin thirty days to add his retaliation claim in an amended complaint.

The district court adopted the magistrate judge's recommendation. The court thus granted summary judgment to the prison employees on the inmates' mail rights and court access claims. Further, the court gave Irvin thirty days to add his retaliation claim.

Irvin did so. In response, Kedzierzawski and Kirkwood filed a second motion for summary judgment. Finding insufficient evidence to support Irvin's retaliation claim, the magistrate judge recommended granting this motion. The district court adopted the recommendation.

On appeal, Irvin says the district court erred in rejecting his § 1983 claim. He contends that evidence shows Renea Bradley, the Marquette Branch Prison's mail room supervisor, delayed sending one of his letters to a fellow inmate because it contained legal information, thus violating his right to send mail. He also says the record supports his claim that Kedzierzawski and Kirkwood violated his right to access the courts by preventing him from processing his grievances. Finally, Irvin argues that evidence shows Kedzierzawski and Kirkwood retaliated against him for filing grievances by ignoring his grievances and denying him postage stamps, hygiene items, and over-the-counter medications.

We now consider Irvin's appeal.[1]

---

1. The district court did not address, and the parties have not briefed on appeal, whether the Prison Litigation Reform Act of 1996

## II

We review a district court's grant of summary judgment de novo. *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 597 (6th Cir.1999). Accordingly, we affirm a grant of summary judgment if there are no genuine issues of material fact such that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III

### A

Irvin first contends that the district court erred in granting judgment to Bradley on his mail rights claim under § 1983. He says Bradley intentionally delayed delivery of a certified letter he sent to a fellow inmate based on its legal content. Such content-based interference with prisoner mail, according to Irvin, runs afoul of the First Amendment.

■■■ Irvin is correct. A prisoner has a First Amendment right to send mail. *Hudson v. Palmer*, 468 U.S. 517, 547, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). A restriction on this right is valid "only if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Interfering with a prisoner's right to send mail simply because the letter contains legal information bears no relation to a legitimate penological interest. *Antonelli v. Sheahan*, 81 F.3d 1422, 1431–32 (7th Cir.1996) (finding allegations that prison official opened and intentionally delayed delivery of legal mail sufficient to state First Amendment claim); *cf. Turner*, 482 U.S. at 89, 107 S.Ct. 2254 ("Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression.").

■■■ But Bradley's alleged delivery delay occurred in September 1996. Irvin, along with the other inmates, asserted their mail rights claim on August 2, 1996, the date they filed the second amended complaint. Irvin cannot rely on evidence of an event that occurred after he filed his claim as support for that claim. The filing of an action fixes the controversy. If he desired to litigate events occurring after he filed his mail rights claim, Irvin needed to file a supplemental pleading under Fed. R.Civ.P. 15(d), which provides that "the court may ... permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."

Irvin never filed a supplemental pleading alleging Bradley's failure to timely deliver his legal mail. This allegation was thus never before the district court. The district court, then, did not err in failing to credit evidence supporting this phantom allegation.

### B

Irvin next challenges the district court's grant of judgment to Kedzierzawski and Kirkwood on his court access claim under § 1983. He says evidence shows Kedzierzawski and Kirkwood prevented him from pursuing grievances.

■■■ The First Amendment affords prisoners a right of access to the courts.

("PLRA") applies to Irvin's § 1983 claim. When applicable, the PLRA requires the administrative exhaustion of a prisoner's § 1983 claim. 42 U.S.C. § 1997e(a). Because we find that the application of the PLRA would have no effect on the disposition of this case, we will not address this issue sua sponte.

"Like others, prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts." *Hudson*, 468 U.S. at 523, 104 S.Ct. 3194; *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). This right "extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus–X v. Blatter*, 175 F.3d 378, 391 (6th Cir.1999).

■■■ Prison officials deny prisoners their right to access the courts by depriving them of a "reasonably adequate opportunity" to challenge their sentence or conditions of confinement. *Bounds*, 430 U.S. at 828, 97 S.Ct. 1491; *Lewis v. Casey*, 518 U.S. 343, 354–55, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). However, depriving prisoners of this opportunity only "in some theoretical sense" will not establish a violation of the right to access the courts. *Lewis*, 518 U.S. at 351, 116 S.Ct. 2174. Rather, a prisoner must show prison officials' conduct inflicted an "actual injury," i.e., that the conduct hindered his efforts to pursue a nonfrivolous legal claim. *Id.* at 351–53, 116 S.Ct. 2174.

■■■ Thus, to prevail, Irvin must prove Kedzierzawski and Kirkwood prevented him from pursuing a legitimate legal claim. Irvin says his own testimony establishes two such actual injuries.

■■■ First, Irvin testifies that Kirkwood failed to return one of his grievances until after the time for an appeal had expired. Second, Irvin testifies that Kedzierzawski and Kirkwood arranged to deny him an indigent store order for postage stamps. He now says he needed a stamp to appeal a misconduct report that implicated his due process rights.[2]

This evidence does not establish an actual injury. Even if Kirkwood prevented Irvin from appealing a grievance, the record gives no indication whether this grievance had any potential merit. Nor does the record show whether Irvin's grievance stated a civil rights claim—prisoners grieve many conditions of their confinement; not all rise to the level of a constitutional violation. And most important, Kirkwood's alleged misdeed occurred after Irvin filed his court access claim.[3] As noted, Irvin cannot support his court access claim by citing evidence of an event that allegedly occurred after he filed his claim.

Likewise, Irvin cannot prove an actual injury based solely on his inability to obtain a postage stamp. He must show that he needed a postage stamp to pursue a nonfrivolous civil rights claim. Irvin offers no such evidence. He merely invites speculation as to how his inability to obtain postage stamps deprived him of meaningful access to the courts.

Lacking evidence of an actual injury, Irvin cannot sustain his court access claim.

### C

Finally, Irvin appeals the district court's grant of judgment to Kedzierzawski and Kirkwood on his retaliation claim under § 1983. According to Irvin, the record contains ample evidence showing Kedzierzawski and Kirkwood sought to stop his grievances through intimidation.

■■■ Prisoners have a First Amendment right to file grievances and access

---

**2.** Irvin offered this testimony in his verified amended complaint. Executed under the penalty of perjury, a verified complaint has "the same force and effect as an affidavit" for evidentiary purposes. *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir.1992); 28 U.S.C. § 1746.

**3.** The inmates filed their second amended complaint on August 2, 1996. Irvin says Kirkwood failed to return the grievance later that month.

the courts without suffering retaliation for so doing. *Thaddeus–X,* 175 F.3d at 388. To establish a violation of this right, a plaintiff must prove three elements: (1) the prisoner engaged in protected conduct, (2) an adverse action was taken that would deter a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was motivated, at least in part, by the prisoner's protected conduct. *Id.* at 394.

Irvin has arguably offered enough evidence to make this showing. By filing multiple grievances against prison employees, Irvin engaged in activity protected under the First Amendment. *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir.2000) (holding that an inmate has an "undisputed First Amendment right to file grievances against prison officials on his own behalf").

Irvin also offers some evidence that he suffered adverse action sufficient to deter a person of ordinary firmness from continuing to pursue grievances. He testifies that Kedzierzawski and Kirkwood refused to file his grievances, often without any explanation. He also offers evidence that they arranged to deprive him of an indigent store order for postage stamps, hygiene items, and over-the-counter medicine.

And the record contains evidence suggesting Kedzierzawski and Kirkwood's alleged actions were motivated by Irvin's protected conduct. Irvin testifies that Kirkwood explicitly warned that filing future grievances would cost Irvin benefits. He further testifies that the staff member who denied his prison store order specifically stated the denial stemmed from his grievances.

However, even assuming he has offered enough evidence to sustain his retaliation claim, Irvin cannot necessarily avoid summary judgment. Irvin sues Kedzierzawski and Kirkwood under

§ 1983. Government actors generally receive qualified immunity in § 1983 actions. Irvin bears the burden of defeating this immunity. *Blake v. Wright,* 179 F.3d 1003, 1007 (6th Cir.1999). He has not met this burden.

The doctrine of qualified immunity shields state actors from liability based on their discretionary acts. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In so doing, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.").

But state actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

This Circuit follows a three-step process when evaluating an assertion of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by suffi-

cient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc) (quotations omitted) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727).

▉▉▉ Thus, assuming Kedzierzawski and Kirkwood violated Irvin's right to be free from retaliation for filing grievances, the question for purposes of qualified immunity is whether this violation involved a "clearly established right of which a reasonable person would have known...." *Id.*

The right not to suffer retaliation for exercising First Amendment freedoms is clearly established. *Cale v. Johnson,* 861 F.2d 943, 949–50 (6th Cir.1988). The contours of that right, however, have evolved in the last several years.

Until recently, this Circuit analyzed retaliation claims as alleging substantive due process violations. Retaliatory conduct violated substantive due process only when it shocked the conscience. *McLaurin v. Cole,* 115 F.3d 408, 410–11 (6th Cir.1997) (citing *Cale,* 861 F.2d at 949–50).

▉▉ In 1999, this Circuit disavowed the substantive due process standard for retaliation claims.[4] *Thaddeus–X,* 175 F.3d at 387–88. Such claims now fall directly under the First Amendment. Retaliatory conduct is actionable under the First Amendment when it would dissuade a person of ordinary firmness from continuing to engage in protected conduct. *Id.* at 394.

In this case, the alleged retaliatory conduct occurred in 1995 and 1996. At that time, the law of this Circuit required that actionable retaliation shock the conscience or involve an egregious abuse of government power.[5] *McLaurin,* 115 F.3d at 410–11.

---

4. In *Thaddeus–X,* this court, sitting en banc, concluded that the United States Supreme Court's decision in *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), established that a retaliation claim asserted under an enumerated constitutional right should be analyzed under that right rather than the more amorphous substantive due process standard. 175 F.3d at 388 ("To the extent that our prior decisions have imposed the 'shocks the conscience' test when prisoners claim retaliation in violation of an enumerated constitutional right, they are in conflict with the Supreme Court's decisions in *Graham* and its progeny and are no longer the law of this Circuit.").

5. In his dissent, Judge Clay suggests that the shocks-the-conscience test did not govern Kedzierzawski and Kirkwood's conduct in 1995 and 1996. He says the new standard for retaliation claims adopted in *Thaddeus–X* "did not effect a profound change in the law ...," but merely recognized the standard for retaliation claims "long ago established" by the United States Supreme Court's decision in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We disagree.

In *Graham,* the Supreme Court held only that the reasonableness test explicitly set forth in the Fourth Amendment governs excessive force claims, rather than the shocks the conscience test applicable to substantive due process claims. *Id.* at 395, 109 S.Ct. 1865. The Court found that the showing required to make out a § 1983 claim required reference to the constitutional right underlying the claim. *Graham* involved an excessive force claim. Thus, the Court concluded that such a claim should be tested under the Fourth Amendment, which provides individuals with "the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *Id.* Because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

But in this case, Irvin makes a First Amendment retaliation claim. Unlike the Fourth Amendment involved in *Graham,* the First Amendment does not express any substantive standard governing intrusions on the rights

█ Kedzierzawski and Kirkwood's alleged retaliatory acts do not meet this heightened standard. A reasonable juror would not find an isolated deprivation of postage stamps and other nonessential items shocking to the conscience. Likewise, the occasional failure to process a grievance is no egregious abuse of government power.

█ Because they did not violate constitutional rights that were clearly established at the time of their actions, Kedzierzawski and Kirkwood are entitled to qualified immunity on Irvin's retaliation claim.[6]

## IV

For the reasons stated above, we AFFIRM the district court's grant of summary judgment to defendants in both Nos. 99–2219 and 99–2311.

CLAY, Circuit Judge, Concurring in part and Dissenting in part.

I concur in the majority opinion except as to its disposition of Irvin's retaliation claim. The majority holds that the defendant prison officials are entitled to qualified immunity with respect to this claim because the retaliatory conduct at issue occurred in 1995 and 1996, prior to this Court's holding in *Thaddeus–X,* and at

guaranteed thereunder. Including no explicit standard, the First Amendment could not have alerted Kedzierzawski and Kirkwood that they were violating Irvin's First Amendment rights.

This Circuit's treatment of retaliation claims supports this conclusion. *Graham* was decided in 1989. Yet in 1997, this Circuit affirmed the shocks the conscience test for First Amendment retaliation claims. *McLaurin v. Cole,* 115 F.3d 408 (6th Cir. 1997). If it not initially clear to this Circuit that *Graham* abandoned the shocks the conscience test, then Kedzierzawski and Kirkwood ought not have recognized as much.

Any suggestion that a standard other than the shocks the conscience test applies to First

that time the officers would only expect that retaliation which shocks the conscience or involves an egregious abuse of government power—and not conduct that would deter a person of ordinary firmness from pursuing his claims—would amount to a violation of one's constitutional rights. Because I believe this holding to be a mischaracterization of the law of qualified immunity, I respectfully dissent.

## I

The standard for qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). With this in mind, this Court has held that in order for a plaintiff to assert a successful § 1983 claim, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo,* 953 F.2d at 1042. "Although it need not be the case that 'the very action in question has previously been held unlawful, ... in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034).

Amendment retaliation claims did not crystalize until *Thaddeus–X.* However, as noted the text, the retaliatory conduct alleged in this case occurred well before *Thaddeus–X.* At the time of these acts, Irvin had only a clearly established right to be free from retaliatory conduct that shocks the conscience.

6. Although Kedzierzawski and Kirkwood raised the defense, the district court did not rely on qualified immunity in granting judgment on Irvin's retaliation claim. We may nevertheless base our affirmance on qualified immunity. *Andrews v. Ohio,* 104 F.3d 803, 808 (6th Cir.1997) (holding that this court can affirm on any ground supported by the record, even if not cited by the district court).

Although conceding that the right not to suffer retaliation for exercising First Amendment rights is clearly established, the majority contends that "the contours of that right" only evolved with our decision in *Thaddeus–X*, which was decided long after the alleged retaliatory incidents took place in this case. However, I do not believe that *Thaddeus–X* so drastically changed the legal landscape such that reasonable officials in the position of Kedzierzawski and Kirkwood would have previously thought that their retaliatory acts were constitutional.

In order to determine whether a constitutional right is "clearly established" at the time of the retaliatory actions in question we "look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996). By focusing on recent changes in this Circuit's analysis of prisoner retaliation claims, the majority fails to take into account binding Supreme Court precedent. When the law of the Supreme Court as set forth prior to *Thaddeus–X* is taken into consideration, it becomes readily apparent that Irvin's First Amendment right to be free from retaliation has long been established.

In *Thaddeus–X* we held that to the extent any of our prior, mostly unpublished, decisions used the "shocks the conscience" standard in adjudicating First Amendment retaliation claims, they contradicted the Supreme Court's approach in *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and were no longer the law of this Circuit. *Thaddeus–X*, 175 F.3d at 388. We further held that retaliation claims would henceforth be analyzed under the standard for violations of the enumerated constitutional right at issue; in that case, the "person of ordinary firmness" standard for First Amendment

claims would replace the amorphous "shocks the conscience" standard of substantive due process analysis. But in so holding, we did not effect a profound change in the law. Instead, we merely clarified the law of the Circuit and brought it in line with established Supreme Court precedent. As we recognized in *Thaddeus–X*, the United States Supreme Court's decision in *Graham* long ago established the proper standard for considering claims related to an enumerated constitutional right. *Id.*

The majority cites this Court's now overruled decision in *McLaurin v. Cole*, 115 F.3d 408 (6th Cir.1997), for the proposition that the "shocks the conscience" standard was applicable to the time period during which the retaliatory acts took place. However, such reliance is misplaced for several reasons. First, *McLaurin* was decided in 1997 and was therefore not binding precedent in 1995 and 1996. Furthermore, to the extent that *McLaurin* purports to explain the previous state of the law, its pronouncement was abrogated by *Thaddeus–X*. As we noted in *Thaddeus–X*, *McLaurin* and previous cases in this Circuit relied upon our decision in *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir.1988), for requiring the heightened standard. However, we revealed the fallacy of this notion in *Thaddeus–X* by explaining that in *Cale* "the inmate's claim was based on his general substantive due process rights and not on the First Amendment." *Thaddeus–X*, 175 F.3d at 387–88 (citing *Cale*, 861 F.2d at 945). Two years earlier in *Riley v. Coutu*, 172 F.R.D. 224 (E.D.Mich.1997), a district court within this Circuit came to a similar conclusion in rejecting a claim that the standard for a retaliation claim requires a substantive due process, "shocks-the-conscience" analysis. The district court noted that "*Cale* discussed only whether the alleged retaliatory action was a violation of the prisoner's

substantive due process rights. There is no indication that the plaintiff pursued a claim under the First Amendment." *Id.* at 228 n. 3. Other circuits have also similarly held. As we noted in *Thaddeus–X,*

> [w]hile several circuits suffer from conflicting case law similar to that outlined above, nearly every circuit has held that First Amendment retaliation claims are cognizable, without referencing substantive due process. *See, e.g., Mitchell v. Farcass,* 112 F.3d 1483, 1489–90 (11th Cir.1997); *Babcock v. White,* 102 F.3d 267, 274–76 (7th Cir.1996); *Crawford–El v. Britton,* 93 F.3d 813, 825–26 (D.C.Cir. 1996), *vacated on other grounds,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Penrod v. Zavaras,* 94 F.3d 1399, 1404 (10th Cir.1996); *Graham v. Henderson,* 89 F.3d 75, 79–80 (2d Cir. 1996); *Cornell v. Woods,* 69 F.3d 1383, 1387–88 (8th Cir.1995); *Woods v. Smith,* 60 F.3d 1161, 1165 (5th Cir.1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996); *Valandingham v. Bojorquez,* 866 F.2d 1135 (9th Cir.1989); *Milhouse v. Carlson,* 652 F.2d 371, 373–74 (3d Cir.1981); *McDonald v. Hall,* 610 F.2d 16, 18–19 (1st Cir.1979).

*Thaddeus–X,* 175 F.3d at 388 n. 4.

For these reasons, any attempt to cite *Cale,* or for that matter, *McLaurin,* in support of applying the "shocks the conscience" standard in the First Amendment context in the instant case "at best represents a gross and reckless misinterpretation of the record presented in those opinions." *Riley,* 172 F.R.D. at 228.[7]

Calling our attention to our 1997 *McLaurin* decision, the majority contends that "[i]f not initially clear to this Circuit

that *Graham* abandoned the shocks-the-conscience test, then Kedzierzawski and Kirkwood ought not have recognized as much." But I find such a conclusion illogical. In light of established Supreme Court precedent and Sixth Circuit case law, as well as decision from other circuits, it would defy reason for us to hold that officials in the position of Kedzierzawski and Kirkwood could reasonably fail to understand that their actions in denying Irvin the right to file grievances regarding his treatment and the conditions of his confinement violated Irvin's constitutional rights. To follow the majority's rationale would allow a mistaken holding in 1997 to be considered binding law in 1995 or 1996. I cannot fathom such a result.

More importantly, we should not concern ourselves with whether the prison officials knew the exact contours of the legal analysis that courts would apply in adjudicating a civil rights claim against them. Instead, we should merely determine whether these officials knew their acts were illegal. The qualified immunity doctrine is intended to protect officers from being held personally liable for mistaken judgments; however, as the majority itself notes, the doctrine offers no protection to those who knowingly violate the law. *See, e.g., Burns v. Reed,* 500 U.S. 478, 479, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In the absence of mitigating circumstances not present here, there is no acceptable range of intentional retaliatory government conduct of the type alleged in the instant case. Thus, I believe the contours of the right to be free from retaliation

---

**7.** Judge Ryan's separate opinion in *McLaurin* also supports this view:

> I know of no published authority from this court relying on *Cale* for the proposition that the shocks-the-conscience standard is appropriately applied in First Amendment

> retaliation claims; the majority's reliance on unpublished case law may be interesting as an academic matter, but those cases simply do not have the weight of authority. *See* 6th Cir. R. 24.

115 F.3d at 413 (Ryan, J., concurring).

were sufficiently developed at the time of the events alleged by Irvin that the defendants were on notice that their retaliatory actions were illegal. The only authority the majority cites to counter this notion is this Court's unpublished order in *Thaddeus-X v. Wozniak,* 175 F.3d 378, 380 (6th Cir.2000). However, because "unpublished opinions are never controlling authority," we are not bound by the determination in that case. *Fonseca v. Consolidated Rail Corp.,* 246 F.3d 585, 591 (6th Cir.2001) (citing *Salamalekis v. Commissioner of Soc. Sec.,* 221 F.3d 828, 833 (6th Cir.2000)); *see* 6th Cir. R. 28(g).

## II

Even if we were to apply the "shocks the conscience" standard, I believe that the retaliatory acts allegedly perpetrated by the defendants would be actionable.

More than a "slight misstep" or the mere failure to process a grievance, Irvin alleges that the officers denied him access to the grievance process by intentionally withholding one of his grievances until the time for appeal had expired. In addition, Irvin alleged that other prison officials, along with, and at the instruction of, Kedzierzawski and Kirkwood, perpetrated a campaign of harassment against him which included intimidation, verbal warnings to stop filing grievances and threats to withhold certain privileges if he did not, and denial of access to grievance forms even prior to the time he was placed on modified grievance status. Furthermore, Irvin alleges that the defendants conspired with others to deprive him of access to items from the prison indigent store—one of the few privileges afforded inmates in prison—in order to convince him to cease filing grievances.

The plain language of the PLRA makes exhaustion a precondition to filing an action in federal court under the statute. 42 U.S.C. § 1997e(a); *Wolff v. Moore,* 199 F.3d 324, 327 (6th Cir.1999); *Brown v. Toombs,* 139 F.3d 1102 (6th Cir.), *cert. denied,* 525 U.S. 833, 119 S.Ct. 88, 142 L.Ed.2d 69 (1998). As of the time the PLRA took effect on April 26, 1996, a reasonable officer would know that prisoners must exhaust their administrative remedies prior to seeking legal redress in federal court concerning the conditions of their confinement. At least one of the incidents alleged in Irvin's complaint occurred after this date.[8]

The blatant and calculated efforts to frustrate the grievance process alleged by Irvin show that Kedzierzawski and Kirkwood knew exactly what they were doing and the precise impact it would have on Irvin's ability to seek redress for the conditions of his confinement and the retalia-

---

8. In addition, even prior to the time the PLRA took effect in 1996, a prior version of 42 U.S.C. § 1997e imposed a limited exhaustion requirement for a claim brought by a state prisoner under § 1983, provided that the underlying state prison administrative remedy met specified standards. Civil Rights of Institutionalized Persons Act of 1980, Pub.L. No. 96–247, § 7, 94 Stat. 349, 352–53 (1982) (prior to 1994 and 1996 amendments). Prior to the 1996 amendments, the exhaustion requirement was "directory" rather than mandatory:

> Subject to the provisions of paragraph (2), in any action brought pursuant to section 1983 of this title by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate an in the interests of justice, continue such case for a period of not to exceed 180 days in order to require exhaustion of such plain, speedy and effective administrative remedies as are available.

42 U.S.C. § 1997e (1982). In 1994, the time period was reduced from 180 days to ninety days.

tion taken against him for exercising his rights.

The facts of the instant case are also similar to *Cale.* In that case, Cale, a prison inmate, alleged that a prison official planted marijuana in Cale's pocket in retaliation for Cale's complaints about the quality of prison food. Cale was then subjected to disciplinary proceedings for possession of the contraband marijuana. The district court granted summary judgment in favor of the defendant prison guard. We reversed, holding that summary judgment should not have been granted on this substantive due process claim:

> [T]he evidence supports a claim that [the prison guard] intentionally and maliciously framed Cale and filed disciplinary charges against him in retaliation for Cale's exercise of his [F]irst [A]mendment rights. This alleged conduct constitutes an egregious abuse of authority within the meaning of *Vinson* [*v. Campbell County Fiscal Court*, 820 F.2d 194 (6th Cir.1987) ].

*Cale*, 861 F.2d at 950. In the instant case, Irvin alleges that the prison officials became aggravated that he was filing grievances and in retaliation conspired to intimidate him and eventually had him placed on modified grievance status to prevent him from filing further grievances. But even prior to this time, Irvin alleges that the officials withheld his grievance forms to prevent him from advancing to the latter stages of the grievance process.[9]

Conversely, our case is materially distinguishable from *McLaurin.* We summarized the facts of that case as follows:

> On August 9, 1991, SPSM officers ordered an emergency count of the inmates just as McLaurin was preparing to take a shower. Upset because of his inability to take a shower, McLaurin struck the fire extinguishing sprinkler in his cell with a shoe, causing his cell to flood. McLaurin was immediately moved to a "quiet cell" for two hours. Following his release from the "quiet cell," McLaurin returned to his cell and allegedly discovered that his legal materials were covered with shampoo and butter. McLaurin later climbed on top of a basketball support in the recreation yard and refused to come down. He was eventually subdued and moved to a cell in SPSM's administrative segregation unit. McLaurin subsequently filed a grievance against Cole for his role in the sprinkler incident.
>
> While housed in the administrative segregation unit, McLaurin demanded his

---

9. In order to properly exhaust an administrative remedy, a prisoner must pursue all levels of the available administrative grievance process. *Wright v. Morris*, 111 F.3d 414, 417 n. 3 (6th Cir.1997). The Michigan Department of Corrections ("MDOC") policy sets forth several steps to the grievance process. MICHIGAN DEP'T OF CORR., Policy Directive 03.02.130, ¶ B (effective June 5, 1995). First the prisoner must attempt to verbally resolve the controversy within two days after learning that grievable issue exists. Policy Directive 03.03.130, ¶ Z. If this verbal attempt at resolution is unsuccessful, the prisoner may within five days of the conversation submit a written grievance to the Step I grievance coordinator. *Id.* At this stage, the prison staff member implicated by the grievance must respond within fifteen days unless an additional fifteen-day extension is granted by the Step I coordinator. *Id.* at ¶ CC. Upon receiving this response, the prisoner must request an appeal form within five days and submit the appeal to the Step II grievance coordinator within five days of the receipt of that appeal form. *Id.* at ¶ HH. At Step II, the warden must respond to the appeal within fifteen days unless an additional fifteen-day extension is granted by the Step II coordinator. Id. at ¶¶ II, JJ. Within ten days of receiving a Step II response from the warden, the prisoner must appeal to the Step III grievance coordinator. Id. at ¶ KK. At this stage the Director of the Department of Corrections or a designated representative must respond. *Id.*

prayer rug and fez. When Cole refused McLaurin's request (because prisoners in administrative segregation are not permitted to possess such items pursuant to MDOC policy), McLaurin purportedly beat his chest and cell window with his hands, kicked the door to his cell, and repeatedly threatened to kill Cole. Cole subsequently issued McLaurin a "misconduct ticket" for his threatening behavior. McLaurin, however, asserts that Cole issued the "misconduct ticket" solely in retaliation for the grievance that McLaurin filed against Cole days earlier.

*McLaurin,* 115 F.3d at 409. McLaurin filed suit alleging that the major misconduct ticket was issued in retaliation for his grievance regarding the destruction and/or deprivation of his legal and religious materials. Based upon these facts, we affirmed the district court's dismissal in favor of the defendant because "McLaurin failed to prove that his filing of a grievance was a substantial or motivating factor behind Cole's issuance of the misconduct ticket, and because Cole's actions were not shocking to the conscience, . . . ." *Id.* at 411.

In *McLaurin,* the defendant Cole's actions did not shock the conscience because there was no casual connection between McLaurin's protected activity and the issuance of the major misconduct ticket. However, in the instant case, there is no evidence that Irvin was denied access to the grievance procedures for any legitimate reason. Instead, Irvin has alleged that deprivation of grievance forms and even his placement on modified grievance status was in direct retaliation for his prior filing of grievances and attempts to access the courts. I believe that this type of retaliation would indeed shock the conscience. I would therefore hold that he has alleged sufficient facts to merit a jury trial and proceed beyond the summary judgment stage.

### III

For the foregoing reasons, I believe that the qualified immunity doctrine is inapplicable to Irvin's retaliation claim and therefore respectfully dissent as to that portion of the majority opinion.