DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Erie County Court of Common Pleas, in which the trial court reversed an earlier ruling by excluding the testimony of expert witnesses presented by appellants, Judith, Rodney, Nicole, Victoria, Ian, and Bryce Watson ("Watsons"), as a sanction for the spoliation of evidence; granting *Page 2 
summary judgment to appellee, Ford Motor Company ("Ford"); and dismissing a complaint for damages allegedly incurred due to the sudden acceleration of a 1989 Ford Thunderbird driven by appellant, Judith Watson. On appeal, appellants set forth the following five assignments of error:
 {¶ 2} "I. The trial court abused its discretion in failing to articulate the basis of its decision to overrule the decisions of the former presiding judge.
 {¶ 3} "II. It was an abuse of discretion to sanction the plaintiffs for the loss of their vehicle by excluding the testimony of their experts.
 {¶ 4} "III. The trial court committed an error of law in granting defendant's motion for summary judgment as to defect.
 {¶ 5} "IV. The trial court committed an error of law in finding that there was no genuine issue of material fact with respect to whether Ford had acted with malice in designing and marketing the 1989 Thunderbird.
 {¶ 6} "V. The court committed an error of law in finding that there was no genuine issue of material fact with respect to the claims of Nicole, Victoria, Bryce and Ian Watson."
 {¶ 7} The relevant, undisputed facts are as follows. On July 6, 1998, the Watsons[1] were en route to Cedar Point amusement park in Sandusky, Ohio, when their 1989 Ford Thunderbird was involved in an accident at a McDonald's restaurant. The *Page 3 
accident occurred after Nicole drove the Thunderbird into a McDonald's parking lot, pulled up to a curb outside the restaurant, put the vehicle in "park," and exited to go into the building. Judith then got into the driver's seat and, without placing her foot on the brake, moved the gear shift lever to the "drive" position. At that point, the Thunderbird moved forward, and did not stop until after it collided with the brick wall of a storage building.
 {¶ 8} The front end of the Thunderbird was extensively damaged in the accident; however, the only physical damage to any of the Watsons was a cut on Ian's nose. Judith turned in a claim to her insurer, Grange Insurance Company, which was eventually settled for $2,000. As part of the settlement, Judith turned title to the Thunderbird over to Grange, which had the vehicle destroyed.
 {¶ 9} On June 22, 2000, the Watsons filed the complaint herein in against Ford, as the manufacturer of the Thunderbird, and Inmon Motor Sales ("Inmon"), a used car dealer through which the Thunderbird was purchased in 1995. In their complaint, the Watsons alleged that the accident was caused by the sudden acceleration of the Thunderbird when Judith switched gears from park to drive. They further alleged that a defective design existed in the vehicle's cruise control module, which caused the Thunderbird to "surge" forward in an uncontrollable fashion. The complaint sought damages under the strict liability theories of defective design, failure to warn, inadequate post-market warnings or instruction, defective manufacture, and nonconformance with manufacturer's representation. The complaint further alleged that Ford was liable in *Page 4 
negligence for its design and manufacture of the Thunderbird and failure to warn of the dangers of sudden acceleration; and liable in tort for breach of warranty, fraud, deceit and intentional infliction of emotional distress. The complaint also alleged negligence per se on the part of Ford for statutory violations related to the above-stated claims, and sought punitive damages due to Ford's reckless and/or malicious conduct regarding the manufacture and sale of the vehicle. As to Inmon, the complaint sought damages for negligence, breach of implied warranty, and violations of Ohio's Consumer Sales Practices Act.
 {¶ 10} On February 25, 2002, Ford filed three separate motions for summary judgment and memoranda in support: (1) to dismiss the Watsons' claims for damages due to intentional infliction of emotional distress; (2) to dismiss the punitive damages claims; and (3) to dismiss the strict liability claims "on Grounds of Spoliation of Evidence." Ford also filed motions in limine to exclude the testimony of the Watsons' expert witnesses, Samuel Sero and William Berg, Ph.D., at trial. Inmon filed its own motion for summary judgment and, on March 8, 2002, Inmon filed concurring motions in support of Ford's motions for summary judgment.
 {¶ 11} On May 1, 2002, the Watsons filed responses in opposition to Ford's motions in limine and for summary judgment and Inmon's motion for summary judgment. In support, both parties cited the deposition testimony of plaintiffs Judith, Nicole, and Rodney Watson, and appellants' expert witnesses, Samuel Sero and William Berg, Ph.D. *Page 5 
 {¶ 12} In her deposition, Judith Watson testified that when the 1989 Thunderbird was purchased as a used vehicle from Inmon in September 1995, it had between 80,000 and 90,000 miles on the odometer. Judith stated that her daughter, Nicole, was the primary driver of the vehicle, which was involved in several minor accidents between 1995 and 1998. Other than repairs due to those accidents, the vehicle received service only "when needed." Judith further testified that, after she replaced Nicole in the driver's seat of the Thunderbird, she shifted the gears from "park" to "drive" without placing her foot on the brake pedal. When the vehicle "took off," she pushed on the brake several times with both feet, but was unable to stop the Thunderbird before it crashed into a nearby brick building. She did not hear the tires squeal, and there were no tire marks left on the pavement.
 {¶ 13} Judith stated that she conducted her own research on the internet after the accident, and became convinced that a lawsuit should be filed. Judith also stated that she reported the incident to the National Highway and Transportation Safety Authority ("NHTSA") within a week, and informed the Better Business Bureau of the accident less than a month after it occurred. Judith also stated that she watched a "Dateline" program produced by NBC Television concerning the sudden acceleration of automobiles, which further convinced her to file a lawsuit against Ford. However, before any legal action was taken, the Thunderbird was turned over to her insurance company, Grange, in exchange for $2,000. When asked to join the Watsons in a lawsuit, Grange declined, and *Page 6 
the vehicle was later destroyed. Judith testified that, other than damage to the Thunderbird, the only injuries suffered by the vehicle's occupants was a cut on Ian's nose.
 {¶ 14} Nicole Watson testified that she saw the Thunderbird's brake lights illuminate at least two times while it was headed for the brick building. Nicole also testified that she did not activate the vehicle's cruise control before Judith got into the driver's seat. Nicole stated that "there was something faulty in the mechanics of the car" that caused it to accelerate. Rodney Watson testified that he did not see the accident; however, he decided that same day to file a lawsuit.
 {¶ 15} In his deposition, Berg testified that random acceleration of a vehicle can only be caused by driver error or "cruise or speed control input on the speed control cable to the throttle." Berg further testified that he did not inspect the Watsons' Thunderbird, did not see any pictures of the vehicle, and did not view the scene of the accident until the day before his deposition was taken. Berg stated that he is not an expert in cruise control mechanisms; however, he has done "some" accident reconstruction. According to Berg's calculations, the Thunderbird accelerated from a stationary position to a maximum speed of 30 m.p.h. before hitting the brick building. Berg further stated that if the throttle of the Thunderbird were 80 percent open, "pumping" the brakes as Judith described would have little effect on the vehicle's speed. Berg also stated that it is impossible to know whether Judith's foot was on the brake or the accelerator when she put the Thunderbird in drive.
 {¶ 16} Berg conceded that, in 2000, the NHTSA found that no credible evidence existed to support a theory that sudden acceleration incidents ("SAIs") in Ford's vehicles *Page 7 
are caused by the defective design of its electronic cruise control systems. Berg also cited a Canadian study which concluded that SAIs are generally caused by driver/pedal misapplication. However, Berg stated that Ford's own studies, which show there can be dozens of electromechanical failures that cause the throttle to open, ignored transient electronic signals as a possible cause of SAIs. Berg further stated that he is not aware of any published report stating that "a spurious or transient caused a sudden, unintended acceleration in a Ford vehicle." He referred to a "fault-tree analysis" prepared by Ford in support of his conclusion that an electronic malfunction could produce electronic "transients." Berg stated that, absent driver error, the only possible cause of SAIs due to wide-open throttle is a transient electronic signal. However, he admitted that no studies have been able to successfully reproduce such an event in a laboratory setting. Berg concluded that, by process of elimination, the only possible cause of SAIs is cruise control malfunction.
 {¶ 17} Sero, a forensic engineer, testified in his deposition that he did not meet with the Watsons or the police officers who responded to the accident, he did not inspect or test the Thunderbird, and he did not review police reports of the accident. Nevertheless, Sero testified that the incident itself is sufficient indication of a "faulted system," even without evidence of a physical defect, to conclude that a design flaw in the Thunderbird's electronic cruise control module caused it to unexpectedly accelerate out of control. Sero further testified that his theory is based on the unverified assumption that *Page 8 
nothing was done to the Thunderbird's cruise control module in the nine years since it was sold by Ford to its original owner.
 {¶ 18} Sero stated that vehicles with SAIs have a "bad grounding connection" with accessories tied into the cruise control "that allow[s] the current flow from the accessories to go right through the cruise control grounding system." Sero further stated that a vehicle can be tested for a bad ground connection and that, without a bad connection, the vehicle is not defective. However, in spite of performing many such tests, Sero was unable to identify the specific combination of factors that activate the electronic "servo," a unit that directs the cruise control by opening the throttle. Sero explained that one way to determine if a transient signal activated the servo is to look for residue on the electrical connections.
 {¶ 19} Sero stated he has never tried to induce an SAI in a Ford Thunderbird. Sero also said that, even if he tested the Watsons' Thunderbird, the most he would find is a "conductive path on the ground [wire]." Otherwise, there would be no evidence left behind after an SAI.
 {¶ 20} Sero testified that, once the throttle is opened by an electrical fault, it takes approximately six seconds for the mechanical "dump valve" to relieve the vacuum in the vehicle's power assisted brakes. Sero concluded that Judith could not stop the vehicle by braking because she released the vacuum assist by pumping the brakes "a couple of times," making them less effective. *Page 9 
 {¶ 21} In addition to Sero's deposition testimony, the record contains a report Sero issued on April 13, 2001, in which he concluded that integrated cruise control systems, such as those used in the 1989 Ford Thunderbird, have "inherent defects" that increase their susceptibility to transient electrical impulses, and can induce the cruise control to open to "near-wide throttle conditions" without driver input. Sero's report further stated that Ford did not employ sufficient "fail safe" mechanisms in its vehicles to override the sudden acceleration of a vehicle due to these defects. For example, the mechanical "dump valve" and electronic switch to turn off the cruise control, both of which can be activated by depressing the brake pedal, are insufficient in to stop the vehicle in the event of an SAI.
 {¶ 22} In support of his conclusions, Sero stated in his report that he has examined wiring diagrams of various cruise control systems, performed hands-on tests and inspections of both stand alone and integrated systems such as the one in the Watsons' vehicle, as well as reviewed documents produced by Ford and its experts concerning their own investigations of reported SAIs. Sero concluded his report by stating that a "fail safe" mechanism could be installed by Ford that would effectively prevent all SAIs, for the cost of $1 per vehicle.
 {¶ 23} On December 5, 2002, Erie County Visiting Judge Joseph Cirigliano filed a judgment entry in which he found that material issues of fact remained as to: (1) whether the Thunderbird "was capable of suddenly accelerating without input from the driver" and whether Inmon should have advised the Watsons of what to do if such acceleration *Page 10 
occurred; (2) whether the Watsons suffered emotion distress as a result of the accident; and (3) whether Ford acted with conscious disregard of safety issues so as to justify an award of punitive damages. Accordingly, Judge Cirigliano denied Inmon's and Ford's motions for summary judgment. In addition, Judge Cirigliano further found that the record contained no evidence that destruction of the Thunderbird resulted in prejudice to Ford, and denied Ford's motions in limine on that basis.
 {¶ 24} On July 21, 2005, following Judge Cirigliano's retirement, the Ohio Supreme Court reassigned the case to Erie County Common Pleas Court Judge Tygh M. Tone, and a jury trial was set to commence on October 10, 2006. However, on June 14, 2006, Ford renewed its motions for summary judgment on the claims of punitive damages, lack of evidence of defect, spoliation of evidence, and lack of evidence to support the Watsons' claims of emotional distress. Ford also filed renewed motions in limine to exclude the testimony of the Watsons' expert witnesses. In support, in addition to the depositions originally filed in the trial court, Ford relied on the depositions of Alan N. Updegrove and Antony Anderson, Ph.D., and the affidavits of Victor DeClerq and Samuel Sero. On June 26, 2006, Inmon renewed its motion for summary judgment. The Watsons filed memoranda in opposition to Ford's renewed motions in limine and motions for summary judgment.
 {¶ 25} Updegrove, a mechanical engineer and retired manager of Ford's Parts and Services Division, testified in his deposition that he investigated SAIs from 1987-1992. Updegrove stated that the study was designed to identify the causes of SAIs reported by *Page 11 
Ford customers during that time period. Updegrove further stated that the Watson case appeared to fit one of the categories of the study: i.e., where the vehicle reportedly accelerated without driver input immediately after the gears were shifted from park into drive mode.
 {¶ 26} Updegrove testified that information on SAIs was collected through an intake form created by his investigative team. In addition to filling out the form, investigators took photographs of the vehicles, performed road tests, and interviewed the owners/operators of the vehicles. Of particular interest were any adjustments made by the driver, including seatbelts and mirrors; the order in which the driver performed operations such as placing his or her foot on the brake and/or accelerator prior to or during gear changes; and the driver's impression of the engine sound when the alleged incident occurred. Actual testing also included acceleration of the vehicle up to 65 m.p.h., followed by an attempt to stop the vehicle by applying the brakes.
 {¶ 27} Updegrove stated that a vehicle will stop if the brakes are applied, even if the driver's foot is still on the accelerator. He further stated that a throttle can be held wide-open by hardware failure such as floor mats, defective linkage, and engine control or speed control malfunction. He explained that, in the event of a malfunction, the servo would be removed from the vehicle and examined, and the results evaluated in conjunction with statements provided by the driver. Updegrove testified that, in many cases of reported SAIs, the driver admitted to applying the accelerator instead of the brake pedal. He also testified that some experts believe it is impossible for an electrical *Page 12 
malfunction to open the throttle. Updegrove also stated that, during the term of his study, a significant number of SAIs were reported by drivers of Hertz and other rental vehicles, leading investigators to conclude that the driver's lack of familiarity with the vehicle was a contributing factor. When asked, Updegrove disagreed with the hypothesis that all SAIs are caused either by driver error or electronic malfunction.
 {¶ 28} Anderson, an electrical engineer hired by the Watsons as an expert witness, gave a deposition at Ford's request on May 11, 2006. In his deposition, Anderson testified that he has never worked for an automobile manufacturer or a parts supplier, and has never designed a cruise control or speed control system that was used in an automobile. Anderson stated that his interest in SAI cases developed when he was first asked to testify on behalf of a plaintiff in an SAI case in 2000. As to this case, Anderson stated that he had not inspected the Watsons' 1989 Thunderbird, and had never driven or tested such a vehicle following a reported SAI. He further testified that some cruise control faults can be caused by a defective "slip ring" connection in the steering mechanism, damaged sheathing on the cruise control cable, or wearing of the electrical contacts, also known as "fretting," and that those conditions are difficult to examine. Anderson stated that, without looking at the Thunderbird, he could not say whether any such conditions would have contributed to the accident in this case; however, there would be an "obvious advantage" to actually inspecting the vehicle. *Page 13 
 {¶ 29} Anderson referred to several studies, including those done by the NHTSA and Updegrove, as the basis for his testimony; however, he did not review Berg's or Sero's depositions. He stated that, as he understood it, the accident occurred because the Thunderbird accelerated when Judith put it in drive. He assumed Judith's foot was on the brake when the gears were changed; however, he stated that if her foot was off the brake at the time, the vehicle normally would have moved forward. Anderson stated he did not know how hard Judith pressed on the brake, or how much force would be necessary to stop the vehicle.
 {¶ 30} Anderson testified that he has not reviewed Sero's studies; he does not know if Sero's theory about the A-pillar connection applies in this case; and he has not tried to recreate any electrical events that lead to SAIs in a laboratory setting. However, he has tested components of cruise control systems to see if they can be "fooled" into thinking the vehicle is going more than 30 m.p.h. Anderson concluded, based on those tests, that a device to prevent the cruise control from engaging at speeds less than 30 m.p.h. would not prevent an SAI from occurring. He stated that his tests were performed on pieces of vehicles obtained from a scrap yard that were not analogous to any of the components used in a 1989 Thunderbird.
 {¶ 31} Anderson stated that, in his opinion, the throttle of a stationary vehicle can only be opened by the electronically controlled servo, or by the driver depressing the accelerator. He further opined that reported SAIs increased in the late 1970s after the introduction of cruise control and began to decline in the late 1980s, after car *Page 14 
manufacturers began installing devices requiring the driver to depress the brake pedal before taking the vehicle from park to drive mode.
 {¶ 32} Anderson testified that it is possible to find evidence of some electrical faults that cause SAIs, including contamination of the cruise control module, and "hang up" of the servo cable. He stated that some faults could be observed upon inspection, but might not be "appreciated" at the time. He also stated that some possible causes of SAIs leave evidence behind and some do not; therefore, it would be "sensible" to inspect the vehicle it if was available. Anderson stated that, in this case, he cannot point to physical evidence of an electrical fault, because he did not inspect the vehicle. Nevertheless, he "wouldn't expect to see any physical evidence anyway." He also stated that, although an inspection is important, even the presence of fretting, a bad ground, corrosion, or other hardware faults would not be sufficient to prove the cause of the SAI, since the "relationship" between the condition and the SAI would still be unknown and there may be other, undetected, faults.
 {¶ 33} In addition to Anderson's deposition testimony, the record contains a report submitted by Anderson on December 28, 2005, in which he stated that:
 {¶ 34} "1. The root cause of Sudden Accelerations identified by Ford's internal studies is electromagnetic interference generated by the interaction of electronic components and systems within the vehicle. *Page 15 
 {¶ 35} "2. The root cause of Sudden Accelerations identified by Ford's internal studies, as far as I have been able to determine, was never disclosed by Ford to the US Government. * * *"
 {¶ 36} Essentially, in his report, Anderson disputed the NHTSA's assumption that intermittent electronic failure "should be reproducible" through testing. Anderson concluded his report by stating that "anyone reading the 1989 NHTSA Report would be likely to be misled to the conclusion that there was not a design defect as the root cause of Sudden Acceleration and that the most likely explanation for these occurrences is pedal error."
 {¶ 37} In his affidavit Victor DeClerq, a former Ford employee, stated that, without inspecting the 1989 Thunderbird, it is impossible to check for flaws in the wiring apparatus. DeClerq further stated those types of flaws might have allowed unwanted electrical impulses to open the throttle, thereby causing the sudden, seemingly uncontrolled, acceleration of the vehicle.
 {¶ 38} In his affidavit, Sero referred to the conclusions reached in his report issued on April 13, 2001. Attached to Sero's affidavit was a letter to the Watsons' attorney, in which Sero stated that, during the time the cruise control unit installed in the Watsons' Thunderbird was in use, "the incident rate of sudden acceleration events * * * drastically increased. My investigations, to date and ongoing, have confirmed the inherent defects in this unit and its susceptibility to malfunction and cause the vehicle to accelerate to near wide open throttle without operator input." *Page 16 
 {¶ 39} On September 25, 2006, Inmon was voluntarily dismissed as a defendant. On September 26, 2006, the trial court filed a judgment entry in which it found that the Watsons did not present evidence sufficient to establish that Ford's conduct caused them substantial harm, or to show that any of Ford's acts were reckless and/or malicious. Accordingly, the trial court granted Ford's motion for summary judgment and dismissed the Watsons' claim for punitive damages. In addition, the trial court found that, as the plaintiffs in this action, the Watsons had a responsibility to preserve all reasonably relevant evidence. The trial court further found that Ford was unquestionably prejudiced by the destruction of the Thunderbird in 1998, since the Watsons were contemplating litigation at that time, and many questions remain as to the cause of the accident due to the vehicle's destruction.
 {¶ 40} Ultimately, the trial court found that Ford was entitled to exclusion of any testimony by the Watsons' expert witnesses "on grounds of spoliation of evidence." Similarly, the trial court found that, without the vehicle, and in the absence of expert testimony, the Watsons were unable to demonstrate that their nine-year-old Thunderbird had a defect which existed at the time it was produced by Ford, or that such a defect was the proximate cause of the accident in this case.[2]
Accordingly, the trial court granted Ford's motion for summary judgment and dismissed the Watsons' design defect claim. *Page 17 
 {¶ 41} Finally, the trial court found that the record contained no admissible evidence that Ford's actions or inactions were the proximate cause of any emotional distress experienced by the Watsons. Accordingly, the trial court granted Ford's motion for summary judgment on that issue and dismissed the Watsons' claims for intentional and/or reckless infliction of emotional distress. A timely notice of appeal was filed in this court on October 26, 2006.
 {¶ 42} In their first assignment of error, appellants assert that the trial court abused its discretion when it granted Ford's renewed motions for summary judgment. In support, appellants argue that, while the trial court retains the power to reconsider and alter prior rulings, its discretion is limited in this case because the facts have not changed since Ford's initial motions for summary judgment were denied. Accordingly, those rulings constitute the "law of the case," which a subsequent judge may review and reverse "only where there were intervening changes in controlling law, new evidence, the need to correct a clear error, or to prevent manifest injustice."
 {¶ 43} This court recently held that the law of the case doctrine encompasses mandates issued by a reviewing court, as well as "`a lower court's adherence to its own prior rulings or to the ruling of another judge or court in the same case.'" Korenko v. Kelleys Island ParkDevelopment Co., 6th Dist. No. E-06-029, 2007-Ohio-2145, ¶ 14, quotingPoluse v. Youngstown (1999), 135 Ohio App.3d 720, 725. "Nonetheless, a trial court always has the inherent power to correct prior errors in or reconsider an interlocutory order entered in the same case even if the prior order was issued by a *Page 18 
different judge." Id, citing State ex rel. Dannaher v. Crawford,78 Ohio St.3d 391, 395, 1997-Ohio-72.
 {¶ 44} It is well-settled that the denial of a motion for summary judgment is an interlocutory order, which is subject to reconsideration at any time prior to the entering of final judgment. Fleming v.Westmeyer, 6th Dist. No. L-05-1121, 2005-Ohio-5568, ¶ 20, citingCelebreeze v. Netzley (1990), 51 Ohio St.3d 89, 90, overruled on other grounds by Internat'l Brotherhood of Elec. Workers, Local Union No. 8 v.Vaughn Indust., Inc., 6th Dist. No. WD-05-091, 2006-Ohio-475. See, also, Civ.R. 54(B) ("[A]ny order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties, * * * is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.") Accordingly, the trial court may, in its discretion, correct its previous errors "`either upon a motion for reconsideration or upon a new motion for summary judgment predicated upon the same law and facts.'" Glick v.Dolin (1992), 80 Ohio App.3d 592, 594, quoting Maxey v. Lenigar (1984),14 Ohio App.3d 458, 459. On appeal, the trial court's decision will not be reversed as an abuse of discretion absent a determination that it was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 45} In this case, before granting Ford's renewed motions for summary judgment, the trial court considered all the evidence that was before Judge Cirigliano when Ford's first summary judgment motions were decided. In considering Ford's *Page 19 
renewed motions, Judge Tone was not required to consider any new facts or evidence. Glick, supra; Cale v. J.R. Johnson (C.A.6, 1988),861 F.2d 943. However, the record shows that Judge Tone did consider additional evidence, including Anderson's deposition, and DeClerq's and Sero's affidavits, as set forth above.
 {¶ 46} Upon consideration of the foregoing, this court finds that Judge Tone's decision to entertain Ford's renewed motions for summary judgment was not arbitrary, unreasonable, or unconscionable and, therefore, did not constitute an abuse of discretion. Accordingly, appellants' first assignment of error is not well-taken.
 {¶ 47} In their second assignment of error, appellants assert that the trial court erred by excluding their experts' testimony as a sanction for spoliation of evidence, rather than imposing a lesser sanction. In support, appellants argue that the sanction imposed is not appropriate in this case, because the 1989 Thunderbird was not intentionally destroyed and, in any event, Ford has not shown that it was prejudiced by the loss of the vehicle.
 {¶ 48} Initially, we note that appellants' argument in support of this assignment of error is directed to the trial court's decision to exclude expert testimony. Accordingly, we must utilize the standard of review that is applied when a trial court excludes evidence.
 {¶ 49} This court has held that "[t]he admission or exclusion of evidence by a trial court will not be reversed absent a clear and prejudicial abuse of discretion." Cincinnati Ins. Co. v. General MotorsCorp. (Oct. 29, 1994), 6th Dist. App. No. 94OT017, citing O'Brien v.Angley (1980), 63 Ohio St.2d 159, 163. As set forth above, an abuse of *Page 20 
discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore, supra.
 {¶ 50} In a products liability case, the plaintiff "is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." Cincinnati Ins. Co. v. General Motors Corp., supra. If the trial court "finds that relevant evidence was, indeed, destroyed, then the court has the power to fashion a just remedy." Simeone v.Girard City Bd. of Edn., 11th Dist. No. 2006-T-0056, 2007-Ohio-1775, ¶ 70, citing American States Ins. Co. v. Tokai-Seiki (H.K.), Ltd.
(1997), 94 Ohio Misc.2d 172, 175. "Even if the court finds that the evidence was not deliberately destroyed, `negligent or inadvertent destruction of evidence is sufficient to trigger sanctions where the opposing party is disadvantaged by the loss.'" Id., ¶ 71.
 {¶ 51} Initially, the proponent of a motion for sanctions based on spoliation of evidence must establish "(1) that the evidence is relevant; (2) that the plaintiffs expert had an opportunity to examine the unaltered evidence; and (3) that, even though the plaintiff was contemplating litigation against the defendant, this evidence was intentionally or negligently destroyed or altered without providing an opportunity for inspection by the defense." Cincinnati Ins. Co., supra, citing Hirsch v. General Motors Corp., 628 A.2d 1108, 1118. Thereafter, the defendant "enjoys a rebuttable presumption that it was prejudiced by the destruction of relevant evidence," and the burden shifts to the plaintiff to persuade the trial court "that there is no reasonable possibility that lack of *Page 21 
access to the unaltered or intact product deprived the defendant of favorable evidence." Id., citing Bright v. Ford Motor Co. (1991),63 Ohio App.3d 256, 260.
 {¶ 52} In fashioning a remedy for spoliation of evidence, "[t]he court must balance `[t]he intent of the offending party, the level of prejudice, and the reasonableness of the offending party's action * * *. The relative importance of the information denied the opposing party bears directly on [the] reasonableness of the offending party's action and the resulting prejudice.'" Simeone, supra, ¶ 73. (Citation omitted.) "The test for prejudice is whether there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the non-spoliating party." Loukinas v.Roto-Rooter Svc. Co., 167 Ohio App.3d 559, 2006-Ohio-3172, ¶ 14, citingNationwide Mut. Fire Ins. Co. v. Ford Motor Co. (C.A.6, 1999),174 F.3d 801, 804; Bright v. Ford Motor Co., supra, at 259.
 {¶ 53} In this case, it is undisputed that: (1) the Watsons were contemplating litigation against Ford when they turned the 1989 Thunderbird over to Grange; and (2) the vehicle was destroyed prior to inspection by Ford's experts. The record contains no evidence as to the service history of the vehicle or what, if any, electronic and/or mechanical parts had been serviced or replaced. The record does, however, contain Sero's testimony that, without a bad ground connection, a vehicle's electronic speed control system is not "defective," and there may be evidence of residue on a vehicle's electrical connections that point to the cause of an SAI. Sero also testified that he had no *Page 22 
way of knowing whether the cruise control module in the nine year-old Thunderbird, which had been driven 118,000 miles, had ever been replaced. The record also contains Anderson's testimony that it is unlikely that the cause of this accident could be found through inspecting the vehicle; however, evidence of SAIs sometimes exists in the form of a contaminated cruise control module or a "hung up" servo cable. As noted by the trial court, Anderson stated it would be "sensible" to inspect the vehicle. In addition, DeClerq stated that it was impossible to rule out flaws in the wiring apparatus without inspecting the vehicle.
 {¶ 54} On appeal, appellants argue that, in spite of the above testimony, Ford could not possibly be prejudiced by the loss of the Thunderbird because: (1) their own experts did not have a chance to inspect the vehicle; and (2) they are willing to "stipulate" that the cause of SAIs can never be determined through the physical inspection of a particular vehicle. Alternatively, appellants argue that the trial court should have imposed a "less severe sanction" by excluding "those parts of the Watsons' experts' testimony based on evidence not available to the defendant * * *." We disagree, for the following reasons.
 {¶ 55} As to the first argument, we are not convinced that the lost opportunity for appellants' expert to inspect the Thunderbird cancels out the potential prejudice to Ford's defense. In fact, such an approach would remove the actual condition of the vehicle entirely from the jury's consideration and reduce the trial to nothing but a battle of experts' opinions and untested theories. See Cincinnati Ins. Co., supra, citing Headley v. *Page 23 Chrysler Motor Corp. (D.Mass.1991), 141 F.R.D. 362, 366. As to the second argument, we find the Watsons' convenient and self-serving "stipulation" to be nothing more than an impermissible attempt to convert a mere argument into undisputed evidence against Ford.
 {¶ 56} As to whether the trial court could have, or should have, imposed a lesser sanction in this case, we note that remedies such as the one suggested by appellants is sometimes found to be appropriate in spoliation cases. Loukinas, supra, ¶ 16, citing Holliday v. Ford MotorCo., 8th Dist. No. 86069, 2006-Ohio-284; Hamilton Mut. Ins. Co. ofCincinnati v. Ford Motor Co. (1997), 122 Ohio App.3d 611, 613;Cincinnati Ins. Co., supra. However, as a matter of public policy, it is the trial court's duty to impose a sanction "which effectively removesthe prejudice caused by the sanctioned party's wrongdoing."Loukinas, supra, citing Transamerica Ins. Group v. Maytag,99 Ohio App.3d 203, 207. (Emphasis original.) As set forth above, the real issue in this assignment of error is whether Ford was prejudiced by the destruction of the 1989 Thunderbird. The testimony of appellants' experts is, admittedly, not based on an inspection of the vehicle in question. Accordingly, appellants' proposed sanction in this case, i.e., excluding only those portions of expert testimony which are based on evidence unavailable to Ford, would result in no sanction at all, and certainly would not remove any prejudice caused by the loss of the vehicle.
 {¶ 57} This court has reviewed the entire record that was before the trial court and, upon consideration thereof, finds that: (1) the condition of the 1989 Thunderbird is relevant to the issues raised in this case; and (2) there is a reasonable possibility, based on *Page 24 
concrete evidence in the record, that an inspection of the 1989 Thunderbird would have produced evidence favorable to Ford's defense. We therefore agree with the trial court's conclusion that the destruction of the 1989 Thunderbird before the commencement of litigation unquestionably prejudiced Ford's ability to defend itself against appellants' product liability claim. A lesser sanction, such as the one proposed by appellants, would be insufficient to remove such prejudice. Accordingly, we conclude that the trial court's decision to sanction appellants by excluding the testimony of their expert witnesses at trial was not arbitrary, capricious, or unreasonable, and therefore did not constitute an abuse of discretion. Appellant's second assignment of error is not well-taken.
 {¶ 58} In their third, fourth, and fifth assignments of error, appellants assert that the trial court erred by granting summary judgment to Ford on the respective issues of design defect, punitive damages, and negligent infliction of emotional distress. Initially, we note that an appellate court reviews a trial court's granting of summary judgment de novo, applying the same standard used by the trial court.Lorain Natl. Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127, 129;Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Having set forth the common standard of review to be employed in these remaining assignments of error, we now turn to each of the individual issues presented for our consideration. *Page 25 
 {¶ 59} In their third assignment of error, appellants assert that the trial court erred by accepting Ford's theory of "no car, no case," and dismissing their design defect claim on that basis. In support, appellants argue that: (1) "it takes no specialized knowledge to perceive that something is wrong if a car takes off without the driver giving it a signal;" and (2) expert testimony is not essential to establishing their prima facie case, since Ford has acknowledged that a stationary car will suddenly accelerate under only two conditions: (1) if the cruise control malfunctioned; or (2) "if the driver mistakenly pushed on the accelerator." We disagree, for the following reasons.
 {¶ 60} In a products liability action, the plaintiff has the burden to show, by a preponderance of evidence, that: "(1) [t]here was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiffs injuries or loss." McDonald v. Ford Motor Co. (1975), 42 Ohio St.2d 8,10, citing State Auto Mutual Ins. Co. v. Chrysler Corp. (1973),36 Ohio St.2d 151. See, also, R.C. 2307.73(A), 2307.74, and 2307.75. Ohio courts have held that the existence of a design defect in a strict products-liability action may be shown by either direct or circumstantial evidence. Hickey v. Otis Elevator Co.,163 Ohio App.3d 765, 2005-Ohio-4279, ¶ 11. However, "`[p]roof of causation must be by a probability. The jury will not be permitted to speculate when [the] defendant's conduct is merely one of several possible causes of plaintiff s injuries.'" Id., ¶ 12, quoting Fogle v. Cessna AircraftCo. (Jan. 16, 1992), 10th Dist. No. 90AP-977. (Other citations omitted.) *Page 26 
 {¶ 61} In our determination as to appellants' second assignment of error, we found that the trial court properly excluded the expert testimony of Sero, Berg and Anderson as to general causes of SAIs in vehicles similar to the Watsons' 1989 Ford Thunderbird. Appellants correctly point out that the record contains Judith Watson testified the Thunderbird accelerated "without a signal from the driver." However, this testimony does not even address, let alone answer, the question of what caused the vehicle to accelerate in the first place. Without any additional evidence as to the possible causes of such an event, the jury would have no choice but to engage in impermissible speculation. Accordingly, appellants' first argument is without merit.
 {¶ 62} In support of their second argument appellants state that, in a letter dated February 8, 1988, Ford reported to NHTSA that "only the * * * cruise control system * * * its [sic] capable in the event of a `failure or malfunction' of opening the throttle without driver impact [sic]." However, a closer inspection of the letter reveals that appellants' reliance is misplaced.
 {¶ 63} The letter was written by Robert Munson, Ford's Director of Automotive Safety, to Michael Brownlee, Director of the Office of Defects Investigation Enforcement for NHTSA. Its purpose was to address questions raised by the NHTSA concerning all reported incidents of SAIs, including those that allegedly arose while a vehicle was moving, not just those incidents where a vehicle reportedly accelerated from a stationary position. Specifically, Ford was asked to "[i]dentify and describe the function of all components in the subject vehicles whose failure or malfunction could result in an *Page 27 
unanticipated increase in engine speed without throttle input by the vehicle operator. * * *" The request was not limited to a discussion of the cruise control system. In responding to the request for information, Munson stated that:
 {¶ 64} "As we [Ford] have previously informed the agency in response to other of your inquiries concerning this subject, only the vehicle speed maintenance control system or `cruise control system' as you have identified it, is capable in the event of `failure or malfunction' of opening the throttle a substantial amount without driver input; moreover, multiple electronic malfunctions in that system would be required for actuation without driver input. Further, even if such multiple malfunctions were to occur, application of the brake pedal would cause the vacuum, which creates the force to actuate the throttle, to be vented; this mechanically deactivates the cruise control. A damaged or missing seal in the speed control servo assembly can also cause a substantial increase in engine speed and power output. The seal, however, is highly unlikely to be damaged or left out during assembly of the servo, but such an occurrence would be detected during the 100 percent inspection during final vehicle checks at the assembly plant. In any event, as is the case with multiple electronic malfunctions, application of the brake pedal would cause the vacuum to be vented, mechanically deactivating the cruise control. Other cruise control system component `failure[s] or malfunction[s],' which could cause an increase in engine speed and power output, do not occur at vehicle speeds below 30 miles per hour, the minimum speed at which the cruise control will operate when it is turned on and set. An example of such a malfunction would be a shorted `Set/Accel' switch. If the system was *Page 28 
turned `On', once the driver accelerated the vehicle to 30 miles per hour, the vehicle could continue to accelerate at two to two and one-half feet per second without driver input. Such hypothetical `failure[s] or malfunction[s] involving vehicle speeds over 30 miles per hour, however, do not occur with `close quarters', as defined in your request. Consequently, we consider these hypothetical failures to be outside the scope of this request.
 {¶ 65} "The structural `failure or malfunction' of certain other components, such as cracking of the intake manifold or an intake manifold core plug being displaced could result in a substantial increase in engine speed and power output. Moreover, any structural `failure or malfunction' which allows air into the engine can result in an increase in engine speed. The amount of the increase in power output will correspond to the magnitude of the air flow. However, such `failures' are not intermittent, and the effects continue to exist until they are repaired. These `failures' would be readily apparent during vehicle inspection. * * *"
 {¶ 66} A review of the above excerpt, taken in context, shows that Munson stated the cruise control module manufactured by Ford was capable of opening the throttle if a failure or malfunction occurs in its electronic components. He did not state that all incidents of wide-open-throttle are caused by electrical failure. In fact, Munson listed many potential causes of failures that lead to wide-open-throttle conditions, most of which are not related to the design of the vehicle's electrical components. Munson did not, as appellants suggest, state that cruise control malfunction is one of only two *Page 29 
possible causes of SAIs. In addition, in responding to government's inquiry, Munson repeatedly stated that all the scenarios presented to Ford by NHTSA were hypothetical, and were unlikely to actually occur. Accordingly, Munson's statements cannot reasonably be interpreted as an admission by Ford that the only possible causes of SAIs such as the one alleged in this case are either (1) malfunction of the vehicle's electronic cruise control system, or (2) driver error.
 {¶ 67} In addition to the above, in spite of the fact that the Thunderbird was nine years old, had been driven over 118,000 miles at the time of the accident, and was involved in at least two prior accidents while being driven by Nicole Watson, the record contains no evidence as to the vehicle's routine maintenance and/or repair history. Accordingly, the record contains no admissible evidence that the cruise control system in this particular vehicle was defective, or that the alleged defect caused the accident.
 {¶ 68} This court has reviewed the entire record of proceedings in the trial court and, upon consideration thereof, finds it contains insufficient evidence to raise a genuine issue of material fact as to: (1) whether there was a design flaw in the 1989 Thunderbird's electronic cruise control module; (2) which existed at the time the vehicle was manufactured; and (3) which caused the vehicle to accelerate out of control without any input from the driver. Accordingly, the trial court did not err by granting summary judgment to Ford and dismissing appellants' design defect claim. Appellants' third assignment of error is not well-taken. *Page 30 
 {¶ 69} In their fourth assignment of error, appellants assert that the trial court erred by granting Ford's motion for summary judgment on the issue of punitive damages. In support, appellants argue that the trial court "should have ascertained whether a reasonable trier of fact could have found clear and convincing evidence of malice on the part of Ford — even if the trial court would not have found malice." Appellants further argue that a "reasonable jury" could find, on this record, that Ford exhibited conscious disregard for the safety of persons who purchased its vehicles, because it was collecting and analyzing information from purchasers of its vehicles, dealers, and the government concerning SAIs. Finally, appellants argue that Ford's published conclusion that a significant portion of SAIs are caused by driver error is actually an attempt to mislead both the government and the public.
 {¶ 70} Appellants rely on the copious amounts of documents produced in discovery, which include the afore-mentioned correspondence between Ford and the NHTSA, and NHTSA reports analyzing whether SAIs are caused by vehicle malfunction or driver error. In addition, appellants refer to internally generated documents, most notably Updegraf s study, which describe reported incidents of SAIs; schematic diagrams and fault-tree analyses produced by Ford engineers in an attempt to trace the origins of SAIs and/or explain possible scenarios which result in SAIs; and certain patent documents filed by Ford, which detail the design of its cruise control module, and state that the goal of improving the device is to prevent SAIs in the future. *Page 31 
 {¶ 71} In Ohio, the purpose of awarding punitive damages "`[i]s that of punishing the offending party and setting him up as an example to others that they might be deterred from similar conduct.'" Preston v.Murty (1987), 32 Ohio St.3d 334, 335, quoting Detling v. Chockely
(1982), 70 Ohio St.2d 234, 240, overruled on other grounds by Cabe v.Lunich (1994), 70 Ohio St.3d 598. To that end, Ohio courts have consistently held that a finding of actual malice is necessary for an award of punitive damages. Id. Actual malice has been defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safely of other persons that has a great probability of causing substantial harm." Id., at 336. Where, as here, the malice alleged is predicated on conscious disregard, "before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm," and whether sufficient evidence was presented "that the party consciously disregarded the injured party's rights or safety." Id.
 {¶ 72} After reviewing the entire record, we conclude that the documents relied on by appellants demonstrate that Ford and the NHTSA were attempting to discover the cause of SAIs. However, we need not determine whether reasonable minds could differ as to whether such knowledge amounts to malice in this case.
 {¶ 73} It is well-settled that, before a plaintiff is entitled to punitive damages, "there must be proof of an underlying independent compensatory damage claim." Miller *Page 32 v. Keybank Nat'l Assoc, 8th Dist. No. 86327, 2006-Ohio-1725, ¶ 50, citing Moskovitz v. Mt. Sinai Medical Ctr. (1994), 69 Ohio St.3d 638,649. Consequently, in Ohio, no civil action may be maintained simply for punitive damages. Moskovitz, supra, citing Bishop v. Grdina (1985),20 Ohio St.3d 26, 28. "Rather, punitive damages are awarded as a mere incident of the cause of action in which they are sought. * * * Thus, compensable harm stemming from a cognizable cause of action must be shown to exist before punitive damages can be considered." Id. (Citation omitted.)
 {¶ 74} As set forth above, appellants' claims for compensatory damages due to a design defect was properly dismissed by the trial court. Because appellants failed to demonstrate an underlying independent compensatory damages claim against Ford, their punitive damages claim fails as a matter of law. Accordingly, the trial court did not err by granting summary judgment to Ford on that issue, and appellants' fourth assignment of error is not well-taken.
 {¶ 75} In their fifth assignment of error, appellants assert that the trial court erred by granting summary judgment to Ford and dismissing their claims for negligent infliction of emotional distress. In support, appellants argue that the record contains sufficient evidence to allow the jury to assess "the emotional distress suffered by the Watson family" as a result of the accident.
 {¶ 76} In order to recover damages due to the negligent or intentional infliction of emotional distress, the plaintiff must prove four elements: *Page 33 
 {¶ 77} "(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the [p]laintiff.
 {¶ 78} "(2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.
 {¶ 79} "(3) that the actor's actions were the proximate cause of plaintiff s psychic injury; and
 {¶ 80} "(4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it."Lykins v. Miami Valley Hosp. (Nov. 20, 2001), 2d Dist. No. 00-CV-2404, citing Pyle v. Pyle (1983), 11 Ohio App.3d 31.
 {¶ 81} In addition, to recover for negligent infliction of emotional distress, the plaintiff must also show that he or she was "`a bystander to an accident or was in fear of physical consequences to his own person.'" Walkosky v. Valley Memorials, 7th Dist. No. 00-JE-39, 2001-Ohio-3386, quoting High v. Howard (1992), 64 Ohio St.3d 82, 85-86, overruled on other grounds in Gallimore v. Children's Hosp. Med.Ctr. (1993), 67 Ohio St.3d 244.
 {¶ 82} In this case, with the exception of Rodney Watson, each of the appellants was either a witness to the accident or was actually involved in the accident. In an attempt to show the psychological and/or emotional effects of the accident, Judith *Page 34 
Watson testified that Victorian, Ian, and Bryce screamed and were "very frightened" by the accident and Victoria sometimes warns her not to drive into buildings. In addition, Nicole Watson testified that she was startled and had to jump out of the way of the vehicle, and Rodney Watson testified that his three children were "white" and "shook up" when he saw them several hours after the accident. The record contains no other evidence that any of the Watsons suffered emotional harm, or that they obtained counseling or psychiatric treatment of any kind.
 {¶ 83} Upon consideration of the entire record that was before the trial court, we find that the record contains insufficient evidence to raise a genuine issue of material fact as to any of the elements necessary to demonstrate negligent infliction of emotional distress. In addition, pursuant our determination of appellants' second and third assignment of error, the trial court correctly excluded the testimony of appellants' experts as to causation, and thereafter dismissed their design defect claim. Accordingly, appellants have not presented any evidence to demonstrate that Ford's actions or inactions proximately caused the accident, let alone any emotional distress resulting therefrom. Appellants' fifth assignment of error is, therefore, not well-taken.
 {¶ 84} On consideration whereof, this court finds further that there remains no other genuine issue of material fact. Accordingly, after considering the evidence presented in a light most favorable to appellant, appellees are entitled to summary judgment as a matter of law. *Page 35 
 {¶ 85} The judgment of the Erie County Court of Common Pleas is hereby affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Erie County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Arlene Singer, J., and Thomas J. Osowik, J., concur.
[1] Although he was not involved in the accident Judith's son, Rodney Watson, is also a party to this action on behalf of his children, appellants, Bryce, Victoria and Ian Watson.
[2] The trial court also found that the issues presented in this case are governed by Ohio, not Michigan, law. However, that issue was not appealed and therefore is not before this court. *Page 1